RETAIL CLERKS INTERNATIONAL ASSOCIA-
TION, LOCAL 1625, AFL–CIO, ET AL. *v.*
SCHERMERHORN ET AL.

No. 13. Argued April 18, 1963.—Decided in part and set for reargu-
ment on one issue June 3, 1963.—Reargued October 16–17,
1963.—Decided December 2, 1963.

*S. G. Lippman* reargued the cause for petitioners.
With him on the briefs on the reargument were *Tim L.
Bornstein* and *George Kaufmann,* and on the original argu-
ment *Mr. Bornstein, Claude Pepper* and *Russell Specter.*

*Bernard B. Weksler* reargued the cause for respondents.
With him on the brief was *John L. Kilcullen.*

*Solicitor General Cox,* by invitation of the Court, 373
U. S., at 757, argued the cause for the United States on
the reargument, as *amicus curiae,* urging affirmance.
With him on the brief were *Arnold Ordman, Dominick L.
Manoli* and *Norton J. Come.*

*J. Albert Woll, Robert C. Mayer, Theodore J. St.
Antoine* and *Thomas E. Harris* filed a brief on the reargu-
ment for the American Federation of Labor and Congress

of Industrial Organizations, as *amicus curiae,* urging reversal. With them on the brief on the original argument were *Joseph L. Rauh, Jr., John Silard* and *Harold A. Cranefield* for the United Automobile, Aerospace and Agricultural Implement Workers of America.

*Richard W. Ervin,* Attorney General of Florida, filed a brief on the reargument for the State of Florida, as *amicus curiae,* urging affirmance, joined and supported by the Attorneys General for their respective States as follows: *Robert Pickrell* of Arizona, *Evan L. Hultman* of Iowa, *William M. Ferguson* of Kansas, *Joe T. Patterson* of Mississippi, *Clarence A. H. Meyer* of Nebraska, *T. Wade Bruton* of North Carolina, *Daniel R. McLeod* of South Carolina, *Frank Farrar* of South Dakota, *George F. McCanless* of Tennessee, *Waggoner Carr* of Texas and *A. Pratt Kesler* of Utah, each of whom also joined and supported his brief on the original argument, together with *Eugene Cook* of Georgia, *Harvey Dickerson* of Nevada, *Helgi Johanneson* of North Dakota, *Robert Y. Button* of Virginia, *George Thompson* of Wisconsin, *John F. Raper* of Wyoming, and *John L. Kilcullen. Richmond M. Flowers,* Attorney General of Alabama, was also on the brief on the original argument. *D. Gardiner Tyler,* Assistant Attorney General of Virginia, and *Frederick T. Gray,* Special Assistant Attorney General, were with *Mr. Button* on a separate *amicus curiae* brief for the Commonwealth of Virginia on the original argument.

*William B. Barton* and *Harry J. Lambeth* filed a brief on the original argument for the Chamber of Commerce of the United States, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The sole question in the case is the one we set down for reargument in 373 U. S. 746, 747–748: "whether the Florida courts, rather than solely the National Labor Relations Board, are tribunals with jurisdiction to enforce

the State's prohibition" against an "agency shop" clause in a collective bargaining agreement.

In this case the union and the employer negotiated a collective bargaining agreement that contained an "agency shop" clause providing that the employees covered by the contract who chose not to join the union were required "to pay as a condition of employment, an initial service fee and monthly service fees" to the union. Nonunion employees brought suit in a Florida court to have the agency shop clause declared illegal, for an injunction against enforcement of it, and for an accounting. The Florida Supreme Court held that this negotiated and executed union-security agreement violates the "right to work" provision of the Florida Constitution and that the state courts have jurisdiction to afford a remedy. 141 So. 2d 269.

We agree with that view.

While § 8 (a)(3) of the Taft-Hartley Act provides [1] that it is not an unfair labor practice for an employer and

---

[1] Section 8 (a)(3) reads as follows:

"It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8 (a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) unless following an election held as provided in section 9 (e) within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee

a union to require membership in a union as a condition of employment provided the specified conditions are met, § 14 (b) (61 Stat. 151, 29 U. S. C. § 164 (b)) provides:

> "Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

We start from the premise that, while Congress could preempt as much or as little of this interstate field as it chose, it would be odd to construe § 14 (b) as permitting a State to prohibit the agency clause but barring it from implementing its own law with sanctions of the kind involved here.

Section 14 (b) came into the law in 1947, some years after the Wagner Act. The latter did not bar as a matter of federal law an agency-shop agreement.[2] Section 8

---

for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." 61 Stat. 140–141, as amended, 65 Stat. 601, 73 Stat. 525, 29 U. S. C. (Supp. IV) § 158 (a)(3).

[2] As stated in the Senate Report on the Wagner Act:

". . . the bill does nothing to facilitate closed-shop agreements or to make them legal in any State where they may be illegal; it does not interfere with the *status quo* on this debatable subject but leaves the way open to such agreements as might now legally be consummated . . . ." S. Rep. No. 573, 74th Cong., 1st Sess., pp. 11–12. Prior to enactment of the Wagner Act in 1935, the States had unquestioned power to regulate or prohibit the closed shop and other forms of union-security agreements. While § 8 (3) of the Wagner Act said "nothing in this Act, . . . or in any other statute of the United States, shall preclude" such agreements, it left open the power of a State to "preclude" them.

(a)(3) of the Taft-Hartley Act also allowed it, saying that "nothing in this Act, or in any other statute of the United States, shall preclude" one.[3]

By the time § 14 (b) was written into the Act, twelve States had statutes or constitutional provisions outlawing or restricting the closed shop and related devices [4]—a state power which we sustained in *Lincoln Union* v. *Northwestern Co.*, 335 U. S. 525. These laws—about which Congress seems to have been well informed during the 1947 debates [5]—had a wide variety of sanctions, including injunctions, damage suits, and criminal penalties. In 1947 Congress did not outlaw union-security agreements *per se;* but it did add new conditions, which, as presently provided in § 8 (a)(3),[6] require that there be a 30-day waiting period before any employee is forced into a union, that the union in question is the appropriate representative of the employees, and that an employer not discriminate against an employee if he has reasonable grounds for believing that membership in the union was not available to the employee on a nondiscriminatory basis or that the employee's membership was denied or terminated for reasons other than failure to meet union-shop requirements as to dues and fees. In other words, Congress undertook pervasive regulation of union-security agreements, raising in the minds of many whether it thereby preempted the field under the decision in

---

[3] Note 1, *supra.*

[4] See State Laws Regulating Union-Security Contracts, 21 L. R. R. M. 66.

[5] H. R. Rep. No. 245, 80th Cong., 1st Sess., p. 34; S. Rep. No. 105, 80th Cong., 1st Sess., p. 6.

[6] Note 1, *supra;* H. R. Rep. No. 245, 80th Cong., 1st Sess., p. 9. As to the differences between agreements for "closed" shops, "union" shops, and related devices, see *Lincoln Union* v. *Northwestern Co.*, *supra*, at 528, n. 2; *American Federation of Labor* v. *American Sash Co.*, 335 U. S. 538, 550–553.

*Hill* v. *Florida,* 325 U. S. 538, and put such agreements beyond state control. That is one reason why a section, which later became § 14 (b), appeared in the House bill [7]—a provision described in the House Report [8] as making clear and unambiguous the purpose of Congress not to preempt the field. That purpose was restated by the House Conference Report in explaining § 14 (b).[9] Sen-

[7] Section 13 of H. R. 3020, 80th Cong., 1st Sess., 1 Leg. Hist. of the Labor Management Relations Act, 1947, 207–208.

[8] "Since by the Labor Act Congress preempts the field that the act covers insofar as commerce within the meaning of the act is concerned, and since when this report is written the courts have not finally ruled upon the effect upon employees of employers engaged in commerce of State laws dealing with compulsory unionism, the committee has provided expressly in section 13 that laws and constitutional provisions of any State that restrict the right of employers to require employees to become or remain members of labor organizations are valid, notwithstanding any provision of the National Labor Relations Act. In reporting the bill that became the National Labor Relations Act, the Senate committee to which the bill had been referred declared that the act would not invalidate any such State law or constitutional provision. The new section 13 is consistent with this view." H. R. Rep. No. 245, 80th Cong., 1st Sess., p. 44.

[9] H. R. Rep. No. 510, 80th Cong., 1st Sess., p. 60:

"Under the House bill there was included a new section 13 of the National Labor Relations Act to assure that nothing in the act was to be construed as authorizing any closed shop, union shop, maintenance of membership, or other form of compulsory unionism agreement in any State where the execution of such agreement would be contrary to State law. Many States have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in those States illegal. It was never the intention of the National Labor Relations Act . . . to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither the so-called 'closed shop' proviso in section 8 (3) of the existing act nor the union shop and maintenance of membership proviso in section 8 (a) (3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy. To make certain that there

ator Taft in the Senate debates stated that § 14 (b) was to continue the policy of the Wagner Act and avoid federal interference with state laws in this field.  As to the Wagner Act he stated, "But that did not in any way prohibit *the enforcement of State laws* which already prohibited closed shops." [10]  (Italics added.)  He went on to say, "That has been the law ever since that time.  It was the law of the Senate bill; and in putting in this express provision from the House bill, [§ 14 (b)] we in no way change the bill as passed by the Senate of the United States." [11]

In light of the wording of § 14 (b) and this legislative history, we conclude that Congress in 1947 did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements.  Since it is plain that Congress left the States free to legislate in that field, we can only assume that it intended to leave unaffected the power to enforce those laws.  Otherwise, the reservation which Senator Taft felt to be so critical would become empty and largely meaningless.

As already noted, under § 8 (a)(3) a union-security agreement is permissible, for example, if the union represents the employees as provided in § 9 (a) (subject to rescission of the authority to make the agreement as provided in § 8 (a)(3)).  Those are federal standards entrusted by Congress to the Labor Board.  Yet even if the union-security agreement clears all federal hurdles, the States by reason of § 14 (b) have the final say and may

---

should be no question about this, section 13 was included in the House bill.  *The conference agreement, in section 14 (b), contains a provision having the same effect."*  (Italics added.)

[10] 93 Cong. Rec. 6520, 2 Leg. Hist. of the Labor Management Relations Act, 1947, 1597.

[11] *Ibid.*

outlaw it. There is thus conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to state laws barring the execution and enforcement of union-security agreements. It is argued that if there is a violation of a state union-security law authorized by § 14 (b), it is a federal unfair labor practice and that the federal remedy is the exclusive one. It is urged that that course is necessary if uniformity is to be achieved. But § 14 (b) gives the States power to outlaw even a union-security agreement that passes muster by federal standards. Where Congress gives state policy that degree of overriding authority, we are reluctant to conclude that it is nonetheless enforceable by the federal agency in Washington.

This result on its face may seem to be at war with *San Diego Council* v. *Garmon,* 359 U. S. 236, decided in 1959, and holding that where action is "arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board." *Id.,* at 245. In *Garmon* a state court was held precluded by the Taft-Hartley Act from awarding damages under state law for economic injuries resulting from peaceful picketing of a plant by labor unions that had not been selected by a majority of the employees as their bargaining agents.

*Garmon,* however, does not state a constitutional principle; it merely rationalizes the problems of coexistence between federal and state regulatory schemes in the field of labor relations; and it did not present the problems posed by § 14 (b), *viz.,* whether the Congress had precluded state enforcement of select state laws adopted pursuant to its authority. The purpose of Congress is the ultimate touchstone. Congress under the Commerce Clause may displace state power (*Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 234–236; *San Diego Council* v.

*Garmon, supra*) or it may even by silence indicate a purpose to let state regulation be imposed on the federal regime. See *Florida Avocado Growers* v. *Paul,* 373 U. S. 132, 141–143.

The Court in *Algoma Plywood Co.* v. *Wisconsin Board,* 336 U. S. 301, 314, stated that "§ 14 (b) was included to forestall the inference that federal policy was to be exclusive" on this matter of union-security agreements. In that case a state agency issued a cease-and-desist order against an employer from giving effect to a maintenance of membership agreement and ordered an employee reinstated and made whole for any loss of pay suffered. It was urged that since § 10 (a) of the Wagner Act gives the Federal Board "exclusive" power to prevent "any unfair labor practice," state power in the federal commerce field was displaced. *Id.,* at 305. State power, however, was held to exist alongside of federal power because of the special legislative history of the union-security provisions of the Act. The dissent did not deny that; rather it proceeded on the ground that, since the dispute arose prior to the 1947 Act, the case was to be judged by the pre-1947 construction of § 8 (a)(3), as to which the majority and minority of the Court were in disagreement.

It also was argued in *Algoma Plywood Co.* that § 14 (b) displaced state law that "regulates" the union shop. The Court said:

> "But if there could be any doubt that the language of the section means that the Act shall not be construed to authorize any 'application' of a union-security contract, such as discharging an employee, which under the circumstances 'is prohibited' by the State, the legislative history of the section would dispel it." 336 U. S., at 314.

Congress, in other words, chose to abandon any search for uniformity in dealing with the problems of state laws barring the execution and application of agreements

authorized by § 14 (b) and decided to suffer a medley of attitudes and philosophies on the subject.

As a result of § 14 (b), there will arise a wide variety of situations presenting problems of the accommodation of state and federal jurisdiction in the union-security field. As noted, *Algoma Plywood Co.* v. *Wisconsin Board, supra,* upheld the right of a State to reinstate with back pay an employee discharged in violation of a state union-security law. On the other hand, picketing in order to get an employer to execute an agreement to hire all-union labor in violation of a state union-security statute lies exclusively in the federal domain (*Local Union 429* v. *Farnsworth & Chambers Co.,* 353 U. S. 969, and *Local No. 438* v. *Curry,* 371 U. S. 542), because state power, recognized by § 14 (b), begins *only with actual negotiation and execution of the type of agreement described by § 14 (b).* Absent such an agreement, conduct arguably an unfair labor practice would be a matter for the National Labor Relations Board under *Garmon.*

We held in *Plumbers' Union* v. *Borden,* 373 U. S. 690, and in *Iron Workers* v. *Perko,* 373 U. S. 701, that *Garmon* preempted the field where employees were suing unions for damages arising out of practices that arguably were unfair labor practices subject to regulation by the National Labor Relations Board. Those cases, however, did not present for decision any problem under § 14 (b), though the question was tendered in the *Borden* case but not passed on either by the state tribunal or by us. 373 U. S., at 692, n. 2.

The relief prayed for below is within the ambit of *Algoma Plywood Co.* v. *Wisconsin Board, supra,* and the regulatory scheme that Congress designed when it adopted § 14 (b).

*Affirmed.*

MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.