Jennie PETIX, Plaintiff,

v.

KABI PHARMACIA OPHTHALMICS, INC. Individually and as a Corporate Successor in Interest to Intermedics Intra Ocular, Inc., and Intermedics, Inc., Defendants.

No. 92–CV–503A.

United States District Court, W.D. New York.

March 31, 1995.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Buffalo, NY (Michael A. Ponterio, Marybeth Scarcello, of counsel), for plaintiff.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY (Cindy Kaplan Bennes, of counsel), for defendants.

## DECISION AND ORDER

FOSCHIO, United States Magistrate Judge.

## JURISDICTION

The parties executed a consent to proceed before the undersigned on January 24, 1994.

## BACKGROUND

Plaintiff, Jennie Petix, filed this diversity action on July 30, 1992, alleging two causes of action for negligence, and under the doctrine of strict products liability. Plaintiff is a New York resident, Defendant Kabi Pharmacia Ophthalmics, Inc. ("Kabi") is a California corporation, and Defendant Intermedics, Inc. is a Delaware corporation. Plaintiff's claims arise out of a surgical procedure wherein an intraocular lens was implanted into her right eye following diagnosis of a cataract.

On December 1, 1993, Defendants filed a motion for summary judgment on the ground that federal law preempted Plaintiff's claims. Plaintiff filed opposition papers on February 14, 1994. Defendants filed a reply memorandum on March 22, 1994. Oral argument was held on March 30, 1994. Thereafter, Plaintiff filed a supplemental memorandum of Law on April 8, 1994, and a sur-reply memorandum was filed by Defendants on May 3, 1994.

Discovery in the matter has been stayed pending the resolution of this motion.

For the reasons as set forth below, Defendants' motion for summary judgment is GRANTED.

## FACTS

In 1981, Defendants introduced the Pharmacia Intermedics Ophthalmics model 024 (Hessburg) anterior chamber intraocular lens into the market for use in relation to cataract surgery.[1] This lens was introduced after the federal Food and Drug Administration ("FDA") granted an Investigational Device Exemption ("IDE")[2] under the Medical Device Amendments to the federal Food and Drug Cosmetic Act. The FDA classified the intraocular lens as a Class III medical device, a classification which is the most heavily regulated, and which required pre-market approval by the FDA. Pursuant to federal regulations, specifically, 21 C.F.R. 813, such intraocular lenses were to be tested on cataract patients who gave their informed consent for the lenses to be used.

Plaintiff, Jennie Petix, was admitted to Kenmore Mercy Hospital in Kenmore, New York on January 15, 1984 after a diagnosis of a cataract in her right eye. Petix was scheduled for a cataract extraction of her right eye, along with an intraocular lens implantation, with the surgery to take place on Janu-

---

1. The fact statement is taken from the Complaint filed in this action, along with the relevant papers filed in connection with Defendants' motion for summary judgment.

2. The purpose of an IDE is to "encourage innovation by exempting promising experimental devices from the usual requirement of establishing the safety and efficiency of a medical device before it could be sold." H.R.Rep. No. 853, 94th

ary 16, 1984.[3]

Prior to the surgery, at the office of Dr. Sara R. Sirkin, a Buffalo ophthalmologist, Petix was provided with an informed consent form. The form specifically stated as follows:

*Clinical Investigation*

The United States Food and Drug Administration, in response to congressional mandate, is requiring an extensive clinical investigation of intraocular lenses to establish facts about safety and efficacy. I understand I have been asked to take part in this study because Dr. Sara R. Sirkin considers me a candidate. I understand the study involves a minimum of one-year observation of the results of my surgery whether a lens is implanted or not. The purpose of this observation is to compare in a similar group of patients the differences, if any, in eyes with and without lens implantations. Information about the results of my surgery will be made available to the Food and Drug Administration. The hospital will comply with requests for reports concerning my eye surgery and follow-up examinations and procedures when reports are requested by participants in the study. Efforts to maintain confidentiality regarding my case will be made, but the hospital cannot guarantee confidentiality. If for any reason I wish to decline participation in the study, I may do so without affecting my future care. It is estimated that 50,000 individuals will receive intraocular lenses as patients in this study.

The informed consent form also indicated that the results of the surgery could not be guaranteed, and set forth specific complications of lens implantations. Petix executed the consent on January 5, 1984.

Dr. Sirkin performed Petix's surgery on January 16, 1984, and inserted an Intermedics Model 024 anterior chamber intraocular lens into Petix's right eye. The surgery was initially successful. Following the surgery, Dr. Sirkin completed a "Lens Accountability Form" which provided the manufacturer, Indermedics Intraocular, Inc., with the type of lens used, and the name, address, and social security number of the patient in whom the lens was implanted.

After the introduction of the Intermedics Model 024 lens into the market, studies were reported indicating that complications could occur from the use of the lens after the standard one-year post-operative follow-up period of the pre-market studies. Several members of the medical community recommended the discontinuation of the close-looped anterior chamber intraocular lenses, of which the Intermedics Model 024 was a type. In May, 1987, the Intermedics Model 024 anterior chamber intraocular lens was voluntarily withdrawn from the market by Intermedics Intra Ocular, Inc. for "marketing reasons."

Subsequent to the withdrawal of the lens from the market, Petix began experiencing visual difficulty in her right eye, and her vision then deteriorated significantly. Dr. Sirkin diagnosed Petix with having pseudophakos bulbous keratopathy in her right eye, and blindness later resulted. In July, 1990, Petix had the lens extracted from her eye as part of a corneal transplant. At the time that the instant motion was filed, Petix was scheduled to have her right eye removed as a result of the continuing deterioration. Petix was never informed by the manufacturer of the withdrawal of the lens from the market, nor was she told of the complications which had been discovered to be occurring as a result of the use of closed-loop anterior

Cong., 2d Sess. (1976), U.S.Code Cong. & Admin.News 1976, 1070.

**3.** Under this procedure, the cataract which has formed on the natural lens of the eye, is removed from the eye, along with the lens, and a new, artificial lens, known as an intraocular lens, is implanted inside the eye in place of the natural lens. Prior to the advent of intraocular lens implantation, following removal of a cataract, patients were required to either wear thick cataract glasses to replace the removed lens, or to wear contact lens which needed to be cared for and replaced frequently. Both cataract glasses and the use of contact lenses resulted in some distortion of vision. The use of intraocular lenses is more convenient for patients, and there is no apparent distortion in the size of objects seen. *See* Exhibit F, Defendants' Motion for Summary Judgment.

chamber intraocular lenses in cataract surgery.

### DISCUSSION

Summary judgment will be granted pursuant to Fed.R.Civ.P. 56 when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The party moving for summary judgment bears the burden of establishing the nonexistence of a genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* at 331, 106 S.Ct. at 2556.

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra,* at 209. In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party. *Anderson, supra,* at 255, 106 S.Ct. at 2513; *Rattner, supra,* at 209.

■ Defendants contend that this action should be dismissed as federal law, specifically the Medical Device Amendments ("MDA") to the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 360k(a), preempts Plaintiff's claims. Plaintiff does not dispute that federal preemption applies to Defendants' conduct between the time of implantation of the lens, in January, 1984, and the date the lens was taken off of the market in May, 1987. *See* Affidavit of MaryBeth Scarcello in Opposition to Motion for Summary Judgment, dated February 11, 1994, at p. 4, ¶ 13. However, Plaintiff contends that, once the lens was taken off the market by Defendants, Defendants had the duty to warn of the hazards of which it became aware, and

that, in New York, there is a continuing obligation of manufacturers to warn persons regarding the use of defective products. Plaintiff further maintains that as such common-law duties are outside the scope of preemption created by the MDA, her claims remain actionable.

■ The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. State law which conflicts with federal law may be preempted. *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). In analyzing the preemptive effect of federal regulations, the Supreme Court has held that "the purpose of Congress is the ultimate touchstone." *Cipollone, supra,* at ——, 112 S.Ct. at 2617; *Retail Clerks International Association v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Cipollone, supra,* at ——, 112 S.Ct. at 2617 (quoting *Retail Clerks, supra,* at 103, 84 S.Ct. at 222). Thus, valid state law may be preempted where Congress expressly preempts state law or Congress evidences an intent to completely occupy a given field, or if compliance with both federal and state law is impossible, and the state law is a barrier to achieving the full purposes and objectives of Congress. *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). A federal agency exercising its regulatory authority may preempt state statutes and regulations if that agency is "acting within the scope of its congressionally delegated authority." *Louisiana Public Service Commission v. FCC,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986) (holding that preemption may result not only from congressional action, but also from federal agencies acting within the scope of their congressionally delegated authority). The party claiming preemption has the burden of proof and "must establish that Congress has spo-

ken clearly and made its intention to preempt unmistakable," or, alternatively, "must demonstrate that federal law preempts state law to the extent that the state law actually conflicts with or frustrates the purpose of federal law." *Bravman v. Baxter Healthcare Corp.*, 842 F.Supp. 747, 753 (S.D.N.Y.1994).

The Medical Device Amendments Act ("MDA") was enacted by Congress in 1976. At the time of the drafting of the MDA, the congressional intent in enacting the statute "was driven by the growing public outcry against the completely unregulated—and often dangerous—nature of the medical devices market." *Bravman, supra,* at 753. Accordingly, Congress' intent in enacting the MDA was to encourage research and development of medical devices while also ensuring that the FDA had the authority to regulate such development to protect individuals from risk from the use of "unsafe and ineffective medical devices." S.Rep. No. 33, 94th Cong., 2d Sess. 2 (1976), U.S.Code Cong. & Admin.News 1976, 1070, 1071.

The preemptive language as set forth in Section 360k(a) of the MDA provides that:

No State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement —

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).

The FDA has interpreted the language of 21 U.S.C. § 360k(a) in its regulations which provide that:

Section 521(a) [codified at 21 U.S.C. § 360k] of the act contains special provisions governing the regulation of devices by States and localities. That section prescribes a general rule that after May 29, 1976, no State or political subdivision of a State may establish or continue in effect any requirement with respect to a medical device intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, or court decision), which is different from or in addition to, any requirement applicable to such device under any provision of the act and which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under the act.

21 C.F.R. § 808.1(b)

FDA regulations limit the preemptive effect of the statute, however, by further stating that:

State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State of local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements.

21 C.F.R. § 808.1(d).

Despite the presence of preemptive language in the statute, Congress' intent to limit state tort actions does not appear in any of the legislative history of the MDA. *Bravman, supra,* at 755. Nonetheless, as the court in *Bravman* stated, "notwithstanding what may have been the original intent of Congress, the Agency Regulations parenthetically include court decisions in its definition of state requirements." *Bravman, supra,* at 755 (citing 21 C.F.R. § 808.1(b)). Further, the Supreme Court, in *Cipollone v. Liggett Group, Inc., supra,* has held, in relation to statutory language regarding warnings contained in advertising cigarettes, the term "no requirement or prohibition [imposed under State law] . . . sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." *Cipollone, supra,* at ——, 112 S.Ct. at 2620. *See also Bravman, supra,* at 755 (observing that "the Supreme Court has determined that state law requirements encompass common law tort actions").

In *Slater v. Optical Radiation Corp.*, 756 F.Supp. 370 (N.D.Ill.1991), *aff'd*, 961 F.2d 1330 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 327, 121 L.Ed.2d 246 (1992), the plaintiff, after having an implant of an intraocular lens in his left eye during cataract surgery, brought an action against the defendant manufacturer based on negligence, strict products liability, and breach of an implied warranty after he encountered significant difficulty with the implanted lens. The court dismissed the plaintiff's claims, holding that the causes of action were expressly preempted by federal law. *Slater, supra*, at 373–74. The court noted that the IDE regulations for intraocular lenses issued by the FDA, 21 C.F.R. § 813 *et seq.*, established specific rules for the investigative use of intraocular lenses which were quite extensive and set forth in great detail the procedures which manufacturers were required to follow in order to be granted exemptions from the safety and effectiveness requirements of the FDCA. *Slater, supra*, at 373. The court then reasoned that these detailed regulations expressly preempted state law claims based on safety and effectiveness where an IDE had been granted, as the FDA had established specific requirements applicable to the lenses which varied from other state regulations and requirements, "including those imposed through court decisions imposing tort liability." *Slater, supra*, at 373. The Seventh Circuit, in affirming the decision, found that, as the FDA had decided, pursuant to its regulations, that intraocular lenses could be sold subject to requirements "designed to ensure that this experimental distribution was in fact a worthwhile experiment," imposing additional requirements "in the name of state tort law" relating to the safety and efficacy of the lenses, such as claiming that the lens should have had different design characteristics, was forbidden by the preemption provision in the MDA. *Slater*, 961 F.2d at 1333. The court, however, specifically noted, that the scope of preemption would be limited to efforts by states to impose sanctions for compliance with federal regulations related to safety and efficacy of experimental lenses. *Slater*, 961 F.2d at 1333.

In *Hunsaker v. Surgidev Corp.*, 818 F.Supp. 744 (M.D.Pa.1992), the court directly addressed the issue of the preemptive effect of the Investigational Device Exemption ("IDE"), the MDA, and the FDCA on state tort causes of action relating to the use of intraocular lenses. In *Hunsaker*, the plaintiff underwent cataract surgery and his physician implanted an intraocular lens into both of his eyes which were manufactured by the defendant. Subsequent to the surgery, the plaintiff lost all vision in one eye, and suffered a substantial loss of vision in the other eye. The court, after analyzing the statute and regulations interpreting that statute, determined that Congress' intent in enacting the statute and the FDA's decision to permit an IDE for intraocular lenses was to encourage investigational use of these medical devices. The court noted that there was a "fundamental difference between a device approved by the FDA for manufacture and sale—that is, approved under the relevant regulations of the FDCA and MDA—and a device approved sufficiently safe and effective for investigation—that is, exempted from the FDCA and MDA under the IDE," *Hunsaker, supra*, at 749, and found that:

> in the latter situation, there is an essential incompatibility between federal law and state law since federal law establishes *both* a floor—the minimum amount of evidence required to show that a device is sufficiently safe for investigational use—*and* a ceiling—the safety standard which, if achieved by a particular device, would demonstrate that the device need not be investigated at all since it is already demonstrated to be safe and effective.

*Hunsaker, supra*, at 749.

As a result, the court held that any of the plaintiff's claims under negligence and strict liability theories were preempted as these claims related to the safety and effectiveness of the intraocular lens at issue, the exact areas which Congress intended to regulate. *Hunsaker, supra*, at 753. *See also Hamilton v. Surgidev Corp.*, 1993 WL 533994 at *3 (E.D.La.1993) (plaintiff's claims regarding the safety and effectiveness of defendant's intraocular lenses were preempted by federal law).

In this case, Petix has raised two causes of action, one claim based on negligence in the design of the intraocular lens implanted in her eye, along with further negligence in failing to adequately test the lens, failing to warn the plaintiff of any potential health hazards, failure of its continuing duty to warn plaintiff of the discovery of any post-manufacture defects, and failure to keep abreast of medical literature relating to the lens, and one claim sounding in strict products liability. An examination of the complaint reveals that both claims relate solely to the safety and effectiveness of the intraocular lens at issue in this case. As such, based on the MDA, the relevant federal regulations, and prevailing caselaw, the court finds that Petix's claims are preempted by federal law.

Petix, however, has conceded that her claims are preempted by federal law from the time of the implant in 1984 until 1987, the year in which Defendant withdrew the intraocular lens at issue in this case from the market. Petix argues that, upon Defendant becoming aware of the dangerous propensities of its product, it had a duty to warn any persons whose health and safety were directly affected by the use of its product. Petix further argues that Defendant's motion for summary judgment on this issue is premature, as there is a genuine issue of material fact as to whether the lens, after its removal from the market in 1987, was a product subject to the regulatory scheme at issue.

As a preliminary matter, the court finds that there is no genuine issue of material fact as to the question regarding whether the intraocular lens at issue in this case was a product subject to the FDA regulatory scheme after the time of its withdrawal from the market. There is no evidence in the statutes or related regulations that Congress intended to remove the protection granted to manufacturers in issuing an exemption from FDA rules and regulations once a manufacturer of a product has removed the product from the market because of its unsuccessful characteristics.

As stated, Congress' intent in granting an IDE was to encourage the discovery and development of useful medical device while, at the same time, protecting the public health and welfare. Indeed, one of the stated purposes of the MDA, along with the IDE, was to allow investigators freedom to research and develop various medical devices. As noted, Plaintiff also concedes that the intraocular lens at issue is a device covered by the MDA.

In *Kemp v. Pfizer*, 835 F.Supp. 1015 (E.D.Mich.1993), the plaintiff made a similar claim. In *Kemp*, the plaintiff's husband underwent heart surgery in June, 1982, and was implanted with a prosthetic heart valve which had been approved as a Class III medical device subject to pre-market approval by the FDA. In July, 1986, plaintiff's husband died of cardiac arrest, allegedly as the result of complications caused by a fracture of the heart valve, a fact later confirmed by an autopsy. Later that year, in November, 1986, the defendant voluntarily withdrew the heart valve from the market. In her complaint, the plaintiff argued that, even if her state claims, including, *inter alia*, negligence, breach of warranty, failure to warn, and fraud, were preempted by the MDA, the preemption should not have applied to her case because the defendant withdrew the heart valve from the market. The court held that, at the time the valve was implanted, it had received pre-market approval by the FDA, and that, "the fact that it was later withdrawn from the market, even if the FDA had mandated the withdrawal, [did] not change the fact that the MDA preempted state law requirements concerning its safety, effectiveness, and otherwise." *Kemp, supra,* at 1023. The court reasoned that:

[t]he MDA allows and encourages manufacturers to produce new medical devices without the threat of tort litigation. If the preemption protection afforded by the MDA were removed once a faulty device was pulled from the market, then the fear and hesitancy in developing the original and ground-breaking medical devices that Congress meant to alleviate would always remain as a bar to the development of needed devices that are potentially dangerous. If manufacturers knew that their umbrellas would be snatched from them whenever it began to rain, then they would

have no incentive to take the risk and venture outside.

*Kemp, supra,* at 1023.

Holding that the defendant's removal of the valve from the market was "merely an example of the process working," the court granted the defendant's motion for summary judgment on the plaintiff's state law claims. *Kemp, supra,* at 1023.

It is clear that some medical devices will meet with great success, while other devices will prove unsuccessful and be ultimately withdrawn from the market. Petix's argument, if brought to its natural conclusion, would permit individuals who participated in clinical studies of experimental medical devices that proved to be unsuccessful to sue, on usual state tort law theories, the manufacturers of these unsuccessful devices as soon as the manufacturer decided to remove the device from the market. The court finds that this argument conflicts with Congress' stated purpose in enacting the MDA, that is, to grant researchers freedom to develop new products without threat of such claims. Under the regulations as propounded by the FDA, manufacturers are required to follow strict guidelines prior to being granted an IDE. To impose an additional requirement on the manufacturer in the form of holding the manufacturer liable under state tort law for any devices that did not prove to be safe and effective, would be contrary to Congress' intent.

Further, Section 360h of Title 21 of the United States Code discusses notification and other remedies as relates to the MDA. It is clear that the notification provisions relate to the Secretary's obligation to make adequate notification if a device intended for human use which has been introduced into the market presents an unreasonable risk of substantial harm to the public health. 21 U.S.C. § 360h(a). Nowhere in the statute, or the related regulations, is there set forth a requirement that the manufacturer is obligated to make notification to the public or users of an exempt device upon withdrawing or recalling the device from the market which had been granted an IDE. As such, a duty to warn under state law would be an additional requirement which is either different from or in addition to those requirements contained in § 360k or in the regulations promulgated by the FDA, and, thus, clearly preempted under federal law. *See Cipollone, supra.*

Accordingly, the court finds that Petix's state law claim relating to Defendant's failure to warn Petix about its intraocular lens after it had been withdrawn from the market in 1987 is also preempted by federal law.

■ Finally, Petix argues that she intends to show at trial that Defendants are not entitled to the preemption as they did not comply with the notification requirements as propounded by the FDA, but, rather, intentionally circumvented the notification process when it voluntarily removed the lens from the market. However, Petix has submitted no evidence in support of this claim, and has not shown any authority for the proposition that voluntarily removing a product from the market circumvents FDA notification requirements. Further, even if Plaintiff could show that Defendants did not comply with FDA requirements in the marketing and withdrawing of its product from the market, the express preemption of state law claims "leaves states no authority to police manufacturers' compliance with federal procedures." *Papas v. Upjohn Co.,* 985 F.2d 516, 518–19 (11th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993) (holding, in case regarding pesticides, that it was "for the EPA Administrator, not a jury, to determine whether labelling and packaging information [was] incomplete or inaccurate," thereby in non-compliance with EPA regulations). *See also Kemp v. Pfizer, supra,* at 1022 (noting that if defendants committed a fraud on the FDA, they would be subject to criminal penalties for such acts).

As the scope of preemption established under the MDA is clearly broad enough to cover Plaintiff's claims, even in light of the presumption against preemption of state police power regulations, the claims must be dismissed. *See Cipollone, supra,* at ——, 112 S.Ct. at 2618. It may be that persons who participate in such experimental uses of medical devices should be advised that a product has been voluntarily withdrawn so that a personal medical evaluation of whether

removal of the device is in that person's best interest can be made. However, that is a question Congress has left to the FDA to address through its broad regulatory authority under the MDA.

## CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment is GRANTED.

SO ORDERED.