**DUTTON et al., Appellants,**

v.

**ACROMED CORPORATION et al., Appellees.**

[Cite as *Dutton v. AcroMed Corp.* (1997), 117 Ohio App.3d 804.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 69332, 69333 and 69358.

Decided Jan. 27, 1997.

---

---

*Claudia R. Eklund,* for appellants.

*Richard I. Werder, Jr., Edward Sebold, Mark Herrmann* and *Catherine W. Smith,* for appellees Acromed Corporation et al.

*Stephen P. O'Keefe* and *John S. Polito,* for appellee Arthur D. Steffee, M.D.

*Tobias J. Hirshman,* for defendant A. L. Itani, M.D.

*John S. Polito,* for defendants John W. Brantigan, M.D., and Cleveland Spine and Arthritis Center.

---

TIMOTHY E. MCMONAGLE, Judge.

In this consolidated appeal, appellants Geneva Dutton, Kathleen Goodmote, and Laurie Quaint challenge the trial court's grant of summary judgment in favor of AcroMed Corporation, the manufacturer of "VSP Bone Plates" and "VSP Bone Screws." Dutton, Goodmote, and Quaint ("appellants") each claimed damages for injuries allegedly sustained as a result of the surgical implantation of VSP bone plates and screws into the pedicles of their spines. Appellants contend that their state law claims for strict product liability and negligence against AcroMed Corporation ("AcroMed") are not preempted by the Medical Devices Amendments of 1976,[1] which preclude the imposition of any "requirement" under state law that is "different from, or in addition to" federal requirements.

On June 26, 1996, the United States Supreme Court announced its decision in *Medtronic, Inc. v. Lohr.*[2] As a result of this decision, AcroMed withdraws its arguments that appellants' manufacturing and design defect claims are preempted but continues to maintain that appellants' failure-to-warn and fraud claims are preempted.[3] Consequently, this court must decide whether summary judgment was appropriately granted in favor of AcroMed on appellants' state law claims for failure to warn and fraud. Last, this court must decide whether summary

---

1. Section 301 *et seq.,* Title 21, U.S.Code.

2. *Medtronic, Inc. v. Lohr* (1996), 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700.

3. Each of appellants' complaints also contained a claim that the bone plates and screws failed to conform to representations pursuant to R.C. 2307.77. AcroMed has implicitly abandoned any argument that these claims are preempted by the MDA by expressly confining its arguments to the impact of the *Medtronic* decision upon appellants' failure-to-warn and fraud claims.

judgment was properly granted in favor of defendant Arthur D. Steffee, M.D. on Laurie Quaint's fraud claim.

## I. DISCUSSION

### A. FDA Regulation of Medical Devices

The FDA regulates medical devices pursuant to the 1976 Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act ("MDA" or "Act").[4] In enacting the MDA, Congress intended to serve the competing purposes of both protecting the public from the harmful effects of a largely unregulated medical device industry[5] and preventing the undue burden on interstate commerce caused by varying state requirements for medical devices.[6]

In introducing the MDA, Senator Edward Kennedy, the bill's sponsor, stated, "The purpose of this legislation is to protect the health and safety of the American people * * *. [T]he legislation is written so as the benefit of the doubt is always given to the consumer * * *. [I]t is the consumer who pays with his health and his life for medical device malfunctions."[7] The report of the Senate Committee on Labor and Public Welfare indicates that the medical device legislation was prompted by the Dalkon Shield litigation. The report explains that the Health Subcommittee believed that medical device legislation was urgently needed because of the health hazards posed by unregulated intrauterine devices.[8]

The Act's legislative history also shows that Congress was concerned with the issue of interstate commerce as the House Committee on Interstate and Foreign Commerce debated the effect that differing state regulations would have on such commerce. The House Report indicates that "[t]he Committee recognize[d] that if a substantial number of differing requirements applicable to a medical device [were] imposed by jurisdictions other than the federal government, interstate commerce would be unduly burdened."[9]

---

4. Section 301 *et seq.*, Title 21, U.S.Code.

5. Before passage of the MDA, the FDA could not review a medical device for safety and effectiveness prior to its being marketed unless the agency could convince a court to treat the device as a drug. See, *e.g.*, *United States v. An Article of Drug Bacto–Unidisk* (1969), 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726.

6. S.Rep. No. 33, 94th Cong., 2d Sess. 5, reprinted in 1976 U.S.C.C.A.N. 1070, 1075; S.Rep. No. 33, 94th Cong., 1st Sess. 1–2 (1975), reprinted in 1976 U.S.C.C.A.N. 1070, 1070–1071.

7. 121 Cong.Rec. 59, 10688 (1975).

8. S.Rep. No. 33, 94th Cong., 1st Sess. 1–2, reprinted in 1976 U.S.C.C.A.N. 1070.

9. H.R.Rep. No. 853, 94th Cong., 2d Sess. 45 (1976).

## B. The Medical Device Approval Process

Medical devices are authorized under the Act to enter the market in one of three ways: by obtaining "premarket approval,"[10] as authorized by the investigational device exemption,[11] or through the premarket notification [12] process. It is this latter method, however, of which most manufacturers take advantage in making new devices available for consumer use.[13]

Less rigorous than the premarket approval process, the premarket notification procedure under Section 510(k) of the Federal Food, Drug, and Cosmetic Act allows the manufacturer to market, without further regulatory analysis, a new device that is "substantially equivalent" to a device already on the market, including a device that was grandfathered into the market by virtue of having been first sold prior to May 28, 1976.[14] A finding of substantial equivalence does not connote FDA approval of the device but, rather, permits the manufacturer to immediately market the device.[15] Critical to a determination of substantial equivalence is whether the manufacturer's labeling is consistent with the device's proposed use as stated in its application.[16]

## C. AcroMed's Medical Devices

AcroMed sought clearance to market its spinal plate fixation system through the use of the premarket notification process. Finding that AcroMed's device was not substantially equivalent to any device already on the market, the FDA twice denied its application. AcroMed was advised that if it wished to market this device, it would have to undergo premarket approval.

Not desirous of undergoing this procedure, AcroMed met with FDA personnel to discuss its options. Upon the advice of the FDA, AcroMed submitted separate Section 510(k) applications for its cancellous bone screw and nested bone plate, specifically omitting any statement that the devices could be used as a spinal fixation device. Moreover, proposed labeling that made any reference to spinal

---

10. Section 360e, Title 21, U.S.Code.

11. Section 360j(g), Title 21, U.S.Code.

12. See Section 807, Subpart E, Title 21, C.F.R.

13. See 17 Journal of Products & Toxics Liability (1995) 4, at 348.

14. Section 360e(b)(1)(B), Title 21, U.S.Code.

15. See Section 807.97, Title 21, C.F.R.

16. See Memorandum issued by the Department of Health and Human Services regarding Device Labeling Guidance appended to AcroMed's brief in reply supporting its motion for summary judgment.

use would have been fatal to a finding of substantial equivalence, and, therefore, these references likewise were omitted. The applications, as modified, were found to cover devices that were substantially equivalent to devices already on the market and were, consequently, cleared for immediate marketing.

### D. The Doctrine of Federal Preemption

Judicial consideration of issues arising under the Supremacy Clause begins with the " 'assumption that the historic police powers of the States [are] not to be superseded by * * * Federal Act unless that [is] the clear and manifest purpose of Congress.' " [17] Whether a federal statute preempts state law is a question of congressional intent.[18]

In the MDA, preemption is controlled by Section 360k, subsection (a), which provides:

"(a) General rule. Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

"(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

"(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act."

In 1978, the FDA promulgated regulations implementing and defining the scope of Section 360k.[19] Under these regulations, Section 360k applies to any state requirement "having the force and effect of law (whether established by statute, ordinance, regulation or court decision)." [20] These regulations, however, restrict Section 360k's preemptive effect so that a state requirement is preempted only when the FDA "has established specific counterpart regulations or * * * other specific requirements applicable to a particular device under the [A]ct, thereby making any existing divergent State * * * requirements applicable to the device different from, or in addition to, the specific [FDA] requirements." [21]

---

17. *Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422, quoting *Rice v. Santa Fe Elevator Corp.* (1947), 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459.

18. *Cipollone v. Liggett Group, Inc., supra* (" 'The purpose of Congress is the ultimate touchstone' of pre-emption analysis."), 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422, quoting *Malone v. White Motor Corp.* (1978), 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443, quoting *Retail Clerks v. Schermerhorn* (1963), 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179, 184.

19. See Section 808.1 *et seq.*, Title 21, C.F.R.

20. Section 808.1(b), Title 21, C.F.R.

21. Section 808.1(d), Title 21, C.F.R.

In listing examples of requirements not preempted by the Act, the regulations specifically state that Section 360k "does not preempt State * * * requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices." [22]

The United States Supreme Court recently addressed the preemptive effect of the MDA in *Medtronic, Inc. v. Lohr.*[23] Relying on the regulations discussed above, the court opined that these regulations provide that "state requirements of 'general applicability' are not pre-empted except where they have 'the effect of establishing a substantive requirement for a specific device.' "[24] In addition, the federal requirements must be "applicable to the device" and will preempt state law only if they are "specific counterpart regulations" or "specific" to a "particular device."[25] Comparing the federal requirements for labeling with the state requirements regarding a manufacturer's duty to warn, the court concluded that the Lohrs' claims for failure to warn were not preempted. The court further opined that the federal requirement were not directed to a specific device or field of device regulation and the state requirements did not specifically relate to medical devices. To the contrary, the state requirements were found to be generally applied and, therefore, not within the preemptive scope of Section 360k.[26]

## II. APPELLANTS' CLAIMS AGAINST ACROMED

### A. Failure-to-Warn Claims

■ Appellants contend that their claims for failure to warn are state requirements of general application and, therefore, not preempted by the MDA. AcroMed, on the other hand, argues that the FDA dictated the labeling to be used in marketing its devices and specifically prohibited AcroMed from including labeling that made any reference to spinal use or nonuse. Thus, they further maintain that any state requirement imposing a duty to warn is "different from, or in addition to" these federal requirements and is, therefore, preempted by the MDA. Using the analysis of the *Medtronic* court, this court is compelled to conclude that appellants' failure-to-warn claims against AcroMed are not preempted by the MDA.

---

22. Section 808.1(d)(1), Title 21, C.F.R.

23. 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700.

24. *Id.,* 518 U.S. at 499, 116 S.Ct. at 2257, 135 L.Ed.2d at 724–725.

25. *Id.*

26. *Id.*

A careful review of the record demonstrates that the FDA required that AcroMed's labeling be consistent with its Section 510(k) application seeking a determination of substantial equivalence. If the labeling failed to be consistent with its application, then AcroMed would risk losing a determination of substantial equivalence and further risk marketability of its device. Hence, AcroMed was prohibited from labeling its device as it had requested, not because of any federal requirements regarding the device but, rather, because the requested labeling would be inconsistent with its application for premarket notification and, therefore, not substantially equivalent to any device already on the market. In such a case, AcroMed would be required to undergo premarket approval, a procedure that the record reflects it vehemently tried to avoid.

In contrast, the federal requirements for labeling are set forth in Section 801.109, Title 21, C.F.R., and are generic in purpose and scope; they are not directed to the regulation of any specific device. Moreover, the state requirements set forth in R.C. 2307.76 that serve as a basis for appellants' failure-to-warn claims underscore a general duty to inform users and purchasers of potentially dangerous products of the risks involved in their use. As the *Medtronic* court found, these state requirements escape preemption because they apply to all products generally, not only to medical devices, and are, therefore, outside the preemptive scope of Section 360k.

We, therefore, find that appellants' failure-to-warn claims are not preempted by the MDA, and it was error for the trial court to grant AcroMed summary judgment on these claims.

### B. Fraud Claims

In their complaints, appellants allege common-law fraud against AcroMed for misrepresenting its approval status to appellants and their physicians. While appellants and AcroMed characterize and argue these claims as being "fraud on the FDA," our reading of appellants' complaints does not comport with such an interpretation. Appellants' allegations of fraud against AcroMed are, for all practical purposes, identical and allege that AcroMed:

" * * * negligently, and/or fraudulently represented that said bone plates and screws were safe and approved for use in the spine by the appropriate regulatory agency. Said representations were false and were made for the intent and purpose of inducing reliance on [FDA] approval in the medical community and patients such as Plaintiff. Plaintiff and her physician did in fact rely upon said misrepresentations and as a direct and proximate result suffered the injuries and damages herein described."

Consequently, we must determine whether appellants' fraud claims against AcroMed, as alleged, are preempted by the Act. As above, we are

compelled to conclude that appellants' fraud claims are not preempted by the MDA.

In order to reach the preemptive scope of Section 360k, a state requirement must not only be "different from, or in addition to" any federal requirement, it also must relate to the "safety or effectiveness of the device." In this case, appellants' fraud claims are based "on a more general obligation—the duty not to deceive." [27] Because appellants' state law fraud claims do not relate to the safety or effectiveness of AcroMed's bone plates and screws, they are not within the preemptive scope of Section 360k.[28] Consequently, appellants' state law fraud claims alleged against AcroMed are not preempted by the Act, and it was error for the trial court to grant AcroMed summary judgment on these claims.

We are mindful, however, that appellants may develop this theory of recovery on remand. In such a case, this court is of the opinion that the *Medtronic* court very specifically addressed this issue and determined that such a claim is not preempted by the Act. To the extent that appellants may allege a violation of a state-imposed duty that is "equal to, or substantially identical to, requirements imposed" under federal law, Section 360k affords no preemption.[29]

On the authority of *Medtronic v. Lohr*,[30] appellants' claims against AcroMed are not preempted by the MDA as a matter of law. Consequently, the trial court erred in granting AcroMed's motion for summary judgment.

Accordingly, appellants' first assignment of error is sustained.

### III. REVIEW OF SUMMARY JUDGMENT FOR DR. STEFFEE

Appellant Laurie Quaint, in her second assignment of error, contends that the trial court erred in granting summary judgment on her purported fraud claim against her surgeon, Dr. Steffee, on the grounds that her claim was time-barred by R.C. 2305.11(B)(1), which provides a one-year statute of limitations for medical claims.[31] Quaint argues that her fourth cause of action sets forth a fraud claim against Dr. Steffee that is separate and distinct from any claim of medical malpractice.[32] Quaint apparently concedes that a medical claim would be time-barred by R.C. 2305.11(B)(1).

---

27. *Michael v. Shiley, Inc.* (C.A.3, 1995), 46 F.3d 1316, 1330, citing *Cipollone, supra.*

28. *Id.*

29. 518 U.S. at 497, 116 S.Ct. at 2256, 135 L.Ed.2d at 722–723.

30. 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700.

31. R.C. 2305.11(B)(1) provides as follows: "[A]n action upon a medical * * * claim shall be commenced within one year after the action accrued * * *."

32. See *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 56, 514 N.E.2d 709, 712–713 ("A physician's knowing misrepresentation of a material fact concerning a patient's

R.C. 2305.11(D)(3) defines a medical claim as "any claim that is asserted in any civil action against a physician * * * that arises out of the medical diagnosis, care, or treatment of any person."

The Ohio Supreme Court, in *Browning v. Burt*,[33] elaborated on the meaning of the term "medical claim" as it is used in R.C. 2305.11(B)(1) and (D)(3), explaining as follows:

"A careful reading of R.C. 2305.11(B)(1) and (D)(3) demonstrates that not all claims asserted against a hospital [or physician] are 'medical claims' subject to the period of limitations set forth in R.C. 2305.11(B)(1). Rather, *a claim against a hospital [or physician] is a 'medical claim' within the meaning of R.C. 2305.11(D)(3), and is subject to the one-year limitation period set forth in R.C. 2305.11(B)(1), only if the claim arises out of the medical diagnosis, care, or treatment of a person.* The terms 'medical diagnosis' and 'treatment' are terms of art having a specific and particular meaning relating to the identification and alleviation of a physical or mental illness, disease, or defect. See, generally, Black's Law Dictionary (6 Ed.1990), at 453–454 and 1502. Conversely, the word 'care' is a general word without a specific legal meaning until placed in a particular context. Under the *ejusdem generis* rule of statutory construction, 'care,' as used in R.C. 2305.11(D)(3) (where the word is preceded by terms such as 'physician,' 'hospital,' 'nurse,' and 'medical diagnosis') means the prevention or alleviation of a physical or mental defect or illness." (Footnote omitted and emphasis added.)

■ Count four of Quaint's complaint, her purported fraud claim, incorporates the allegations of counts one through three and the following allegations:

"18. At all times herein relevant, Defendant Steffee is a doctor, licensed to practice medicine in the State of Ohio and holding himself out as a specialist in orthopedic surgery.

"19. Defendant Steffee negligently and/or intentionally made misrepresentations concerning Federal Drug Administration approval of said devices [VSP bone plates and bone screws] in the spine, which representations were relied upon by plaintiff. In fact, these devices were never approved by the Federal Drug Administration for use in the spine, and Defendant Steffee knew or should have known of this fact. Plaintiff did not learn that these devices were not

---

condition, on which the patient justifiably relies to his detriment, may give rise to a cause of action in fraud independent from an action in medical malpractice.").

**33.** *Browning v. Burt* (1993), 66 Ohio St.3d 544, 557, 613 N.E.2d 993, 1003.

Federal Drug Administration approved until such information was made public in December, 1993.

"20. *Defendant Steffee, in using these devices in Plaintiff's spine, breached the standard of care for surgeons under the same or similar circumstances and in so doing, proximately caused Plaintiff the injuries and damages herein described.*" (Emphasis added.)

We perceive these allegations as setting forth a "medical claim," as defined by R.C. 2305.11(D)(3), and not one for fraud, as argued by Quaint. The underlying factual basis of Quaint's claim is that Dr. Steffee's decision concerning what type of screws and plates to use in her care and treatment (*i.e.,* devices not approved by the FDA for spinal use) breached the applicable standard of care for spinal surgeons and proximately caused her injuries. Such allegations are tantamount to a claim for medical malpractice.[34]

Accordingly, appellant's second assignment of error is overruled.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

HARPER, P.J., concurs.

PATTON, J., concurs in part and dissents in part.

PATTON, Judge, concurring in part and dissenting in part.

On May 16, 1996, the majority denied appellee Arthur Steffee's motion to dismiss and then granted appellant Geneva Dutton's motion to amend her notice of appeal. These motions had been referred to the merit panel for consideration but were granted prior to hearing without benefit of oral argument. At the time, I believed the majority improvidently denied the motion to dismiss and dissented without opinion from the majority's actions due to its extraordinary haste to rule on the motion. I now take this opportunity to dissent in part.

App.R. 3(D) states:

"Content of the notice of appeal. The notice of appeal shall specify the party or parties taking the appeal; shall designate the judgment, order or part thereof appealed from; and shall name the court to which the appeal is taken. The title of the case shall be the same as in the trial court with the designation of the appellant added, as appropriate."

---

34. See *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673, paragraph one of the syllabus.

The purpose of the App.R. 3(D) notice requirements is to advise a party to the appeal of what judgment appellants are undertaking to appeal. *Maritime Mfgs., Inc. v. Hi–Skipper Marina* (1982), 70 Ohio St.2d 257, 258–259, 24 O.O.3d 344, 344–346, 436 N.E.2d 1034, 1035–1036. This court has held that it is without jurisdiction to review a judgment or order that is not designated in the appellant's notice of appeal. *Parks v. Baltimore & Ohio RR.* (1991), 77 Ohio App.3d 426, 428, 602 N.E.2d 674, 675–676; *Schloss v. McGinness* (1984), 16 Ohio App.3d 96, 98, 16 OBR 101, 103, 474 N.E.2d 666, 668.

The majority erred by denying Steffee's motion to dismiss because appellant's notice of appeal did not, either specifically or inferentially, refer to the summary judgment granted to Steffee. The trial court granted summary judgment to both Acromed and Steffee in the same half-sheet journal entry. However, appellant's notice of appeal specifically indicated its desire to appeal from only the judgment for the "[c]orporation on the issue of federal preemption."

Clearly, the notice of appeal referred to Acromed only and, by direct implication, did not purport to appeal from any order relating to Steffee. In fact, appellant conceded this point at oral argument, maintaining only that she meant to include Steffee in the notice of appeal, but failed to do so.

Appellant's concession necessarily admits that this court lacks jurisdiction to hear her appeal against Steffee. In fact, by granting appellant's motion to amend her notice of appeal (which she did by subsequently including Steffee), the majority, too, in effect conceded the defective nature of appellant's notice of appeal. However, once Steffee raised his motion to dismiss the appeal, we lacked authority to do anything other than rule on our own jurisdiction to hear the appeal. Our lack of jurisdiction in similar circumstances has been repeatedly noted by this court. See, *e.g.*, *State v. Standberry* (Feb. 15, 1996), Cuyahoga App. No. 69079, unreported, at 4, 1996 WL 65875; *Chotkevys v. Seman* (Sept. 21, 1995), Cuyahoga App. No. 67812, unreported, at 3, 1995 WL 558871.

I believe the majority acted rashly by denying the motion to dismiss and subsequently permitting appellant to amend her notice of appeal, especially since it did not explain its reasons for denying the motion to dismiss. However well intentioned the majority's actions, it cannot exercise jurisdiction where none exists. For these reasons I would have granted Steffee's motion to dismiss the appeal.