[No. 40274.     Department Two.     February 20, 1969.]

*In the Matter of the Assessment of Contributions or Interest Against* Fors Farms, Inc.
Fors Farms, Inc., *Respondent,* v. Washington State Employment Security Department, *Appellant.*[*]

The Attorney General, Richard M. Montecucco, Joseph M. Littlemore, and James M. Jackson, Assistants, for appellant.

[*]Reported in 450 P.2d 973.

*Jacobs, Steiner & Smith* and *Edmund F. Jacobs,* for respondent.

HILL, J.—This is an appeal from a judgment of the Superior Court for Pierce County holding that certain employees of Fors Farms, Inc. (hereinafter referred to as Fors) were engaged in services "incidental to ordinary farming operations," and that their wages were therefore exempt from the Washington State Unemployment Compensation tax.[1]

Fors is engaged in the poultry business. It operates a hatchery in Puyallup, Washington. The hatchery building is owned by a sister corporation. The eggs hatched there have been laid by hens specially bred from Fors' "grandparent" stock. These hens with roosters are placed with independent farmers who care for them and who deliver all fertile eggs to the hatchery. Fors has retained title to approximately half of these chickens.

When the chickens hatched from the eggs are 1-day old, Fors distributes them to independent growers under contracts whereby Fors retains title to the chickens, and the growers agree to raise them. About 5 to 10 per cent are

---

[1]"The term 'employment' shall not include service performed:

"(1) On a farm, in the employ of any person, in connection with the cultivation of the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wild life, or in the employ of the owner or tenant or other operator of a farm in connection with the operation, management, conservation, improvement, or maintenance of such farm and its tools and equipment; or

"(2) In packing, packaging, grading, storing, or delivering to storage, or to market or to a carrier for transportation to market, any agricultural or horticultural commodity; but only *if such service is performed as an incident to ordinary farming operations.* The exclusions from the term 'employment' provided in this paragraph shall not be deemed to be applicable with respect to commercial packing houses, commercial storage establishments, commercial canning, commercial freezing, or any other commercial processing or with respect to services performed in connection with the cultivation, raising, harvesting and processing of oysters or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption." (Italics ours.) RCW 50.04.150.

raised for the purpose of egg laying and the remainder (fryers and broilers) are raised for human consumption. Fors provides the feed and medicine; periodically inspects the independent contract growers' facilities; advises the growers on the methodology of poultry raising, and determines when the fryers and broilers are ready for the market. The grower provides the housing, equipment, lighting, labor, et cetera necessary to raise the chickens. Fors pays the grower a brooding and rearing allowance of 2.5 cents for each fowl marketed, and about 2 cents a pound for each chicken that is processed at the processing plant. This amount covers the growers' operating expenses (housing, equipment, lighting, labor and the like) and his profit. Payment is made under a uniform price schedule regardless of the market price received by Fors for the chickens.

Fors also owns a feed mill in Tacoma, Washington, where it purchases raw grain and converts it into chicken feed, most of which is distributed to the independent contract growers. A small amount of the feed, about 5 to 10 per cent, is sold to other poultry producers. This amount apparently is feed not intentionally produced for sale, but is merely the excess over the needs of the contract growers.

Fors also owns a chicken processing plant in Seattle, Washington, where the chickens raised by the contract growers are delivered to be slaughtered, plucked, eviscerated, packaged, and from there sold to retailers. Fors does not retail any of its chickens.

Fors also owns several small farms and raises some chickens on these.

Of the poultry handled at the Seattle plant, about 9.2 per cent are chickens raised by Fors at its own farms; about 73.9 per cent are chickens raised by the contract growers; and the remaining 16.9 per cent are other poultry (turkeys, ducks, and the like) purchased already processed from other producers solely to enable Fors to accommodate certain retailers who prefer to buy all their poultry from one wholesale source.

Fors employs 90 to 95 persons at its Seattle processing plant; about 10 at the Tacoma feed mill; 20 to 25 at the hatchery; 3 on its own farms; and 4 field supervisors who inspect and aid the contract growers on their farms.

Prior to 1965, the feed mill, processing plant, hatchery, and growing operation were each operated by a separate corporation, all of which were owned by the Fors family. At that time the feed mill corporation and the processing corporation were subject to the unemployment compensation tax, and the hatchery corporation and the corporation conducting the growing operation were not. In 1965, these corporations, with the exception of the hatchery, were merged into a single corporation conducting all of their operations and joined with the hatchery corporation in a joint venture to operate the hatchery.

The Employment Security Department initially ruled that the merged corporation's operation was primarily agricultural and exempt from the unemployment tax. The department, however, reconsidered and levied an assessment against Fors for unemployment compensation taxes on wages paid by Fors to the employees at the processing plant and the feed mill, and also to the four field men or supervisors.

Upon Fors' objection, a hearing was held and the appeal tribunal ruled that the employees in the processing plant and the feed mill were not engaged in work falling within the agricultural labor exemption and, therefore, their wages were subject to the unemployment compensation tax. However, the appeal tribunal modified the assessment appealed from by holding that the four field men or supervisors were engaged in work falling within the agricultural labor exemption.

Fors petitioned for a review of the proceedings had before the appeal tribunal to the Commissioner of the Employment Security Department. The commissioner, after reviewing the record, approved the decision of the appeal tribunal. This decision of the commissioner was appealed to the Superior Court for Pierce County which reversed the

commissioner and held that all of Fors' employees were engaged in labor performed "as an incident to ordinary farming operations" and, therefore, their wages were not subject to the unemployment compensation tax.

The superior court judgment sweepingly reversed the decision of the Commissioner of the Employment Security Department which had approved the decision of the appellate tribunal. However, the appellate tribunal's decision had been favorable to Fors, insofar as the four field men or supervisors were concerned.

On this appeal, it is conceded that the department is no longer contending that a tax should be paid on the wages of the four supervisors and that the controversy involves only the status of the employees of the processing plant and the feed mill.

■■ The appeal raises an interesting question, the answer to which turns on whether Fors is a corporate farmer incidentally processing the chickens most of which are raised by contract growers, or whether it is a processing corporation incidentally raising some of the chickens which it processes. Our inquiry into the nature of Fors' operation is basically one of seeking the main purpose of that operation rather than looking at each aspect thereof. *See State v. Christensen*, 18 Wn.2d 7, 137 P.2d 512, 146 A.L.R. 1302 (1943). Our inquiry further must be made in the light of the established principle that an exemption from a taxation statute must be strictly construed in favor of the application of the tax and against the exemption, and that the burden of proof is on the person seeking the exemption. *Unemployment Compensation Dep't v. Hunt*, 17 Wn.2d 228, 135 P.2d 89 (1942); *In re St. Paul & Tacoma Lumber Co.*, 7 Wn.2d 580, 110 P.2d 877 (1941). Further, RCW 50.32.150 provides that "the decision of the commissioner shall be prima facie correct, and the burden of proof shall be upon the party attacking the same."

In the present case, the superior court reversed the ruling of the commissioner, relying heavily on *Wirtz v. Tyson's Poultry, Inc.*, 355 F.2d 255 (8th Cir. 1966), stating that the

*Tyson* case was "just about on all fours with the instant case." However, it seems to us that there are distinctions both in the facts and the applicable law between this and the *Tyson* case.

Tyson's Poultry, Inc., was engaged in the egg producing business; it did not operate a processing plant. It produced 73 per cent of its eggs on farms which it owned or leased or operated. Only 27 per cent of its eggs were produced by independent contract growers from chickens owned by Tyson. Tyson, like Fors, provided the feed, medical care, and supervisory personnel and also paid the growers in accordance with a uniform schedule unrelated to the market price that Tyson received for the eggs. The contention in that case was that the processing of the 27 per cent of the eggs produced by the contract growers would be enough to defeat the exemption. There was no question that the Tyson operation was an integrated farming operation and that Tyson was, indeed, a farmer.

The critical question in this case is whether or not the services rendered by the employees in question are "incidental to ordinary farming operations." In *Tyson*, the employees were engaged in the handling, cooling, grading, candling, and packing of eggs, while the employees in the present case were engaged in the processing of grains into chicken feed and in the processing of live chickens into marketable food products. The *Tyson* case concerned the Federal Fair Labor Standards Act (29 U.S.C.A., § 201 *et seq.*), not an unemployment compensation statute as here. The regulations promulgated under that act provide that handling, cooling, grading, candling, and packing of eggs constitute services exempt under its agricultural provisions. *See* 29 C.F.R., Labor, § 780.166 (d). It is extremely doubtful whether, if the facts in the present case had been before the court in the *Tyson* case, the agricultural exemption would have been upheld, particularly in view of a regulation reading:

> Feed dealers and processors sometimes enter into contractual arrangements with farmers under which the latter agree to raise to marketable size baby chicks sup-

plied by the former who also undertake to furnish all the required feed and possibly additional items. Typically, the feed dealer or processor retains title to the chickens until they are sold. Under such an arrangement, the activities of the farmers and their employees in raising the poultry are clearly exempt. The activities of the feed dealer or processor, on the other hand, are not "raising of poultry" and employees engaged in them cannot be exempt on that ground. Employees of the feed dealer or processor who perform work on a farm as an incident to or in conjunction with the raising of poultry on the farm and engage in no nonexempt activities during the workweek may, however, be exempt as employed in "secondary" agriculture . . . . 29 C.F.R., Labor, § 780.135.

A federal court—passing on the applicability of the agricultural exemption under the Fair Labor Standards Act to Fors' operation—would not be likely to give much consideration to the *Tyson* case because of the different services involved in the two cases and because of the different treatment accorded each service under the regulations. For these reasons, we do not believe that *Tyson* is dispositive of the present case.

Fors also argues that *State v. Christensen, supra,* is controlling on this appeal. Again we do not agree. In *Christensen,* the primary question was whether milk truck drivers employed by dairy farmers fell within the agricultural exemption to the unemployment compensation act. That case held that the drivers were within the exemption. The dairies in that case owned or leased lands on which the cows were pastured and on which feed for the cows was grown. There was no interposition of any independent contractors who raised the cows or the feed, or who processed the milk. All this work was done by the dairies. It was conceded that these dairies were agricultural in nature. The only question was whether the sale of the milk by the milk truck drivers on their routes was "incidental to ordinary farming operations." The trucks were kept on the dairy farms and they were loaded there each morning. Sales of milk, other than that sold from these trucks on milk routes, was a wholesale operation. In holding that the operation of

the truck routes was incidental to ordinary farming operations, this court stated that "it must be conceded that one of the main purposes of all farming operations is the sale of commodities produced on the farm." (*State v. Christensen, supra,* at 23) The court, in that case, quoted with approval from *Davis & Co. v. Mayor,* 64 Ga. 128, 37 Am. Rep. 60 (1879):

> " 'The business of a farmer is production, not trade, and the sale *directly by himself of what he rears or produces is merely occasional or incidental. . . . The producer whose trade is incident to production, and the middleman whose trade is intermediary between the producer and the consumer,* belong not to the same class, but to different classes of subjects in a scheme of taxation.' " (Italics ours.) p. 25

■ We continue to recognize that one of the main purposes of a farming operation is to sell its products, provided that, as indicated in the foregoing quotation, the sale is made by the farmer who produces the product or by one "whose trade is incidental to that production." That is not the situation in the *Fors* case.

We start with the basic proposition that the employees in processing plants and in feed mills were intended to be covered by unemployment compensation, and they were so covered when the processing plant and the feed mill were operated by separate corporations. There then was no question of an agricultural exemption. They continue to do the same work for the same purpose, but because there has been a corporate merger, including a corporation engaged in poultry raising, the processing and feed mill operations are claimed to have become incidental to an ordinary farming operation.

There is nothing in the history or language of the unemployment compensation act that indicates that the legislature intended to make the availability of unemployment compensation turn upon the technicality of corporate organization, and there is nothing to indicate that the legislature intended the agricultural exemption to cover the em-

ployees of every business activity that might be owned by a farmer.

■ Corporations are entitled to any tax benefits that accrue through corporate reorganization. It seems to us, however, that there is a distinction between tax transactions involving taxes for revenue only, and the taxes imposed and held in trust for the benefit of a particular group when society is attempting to aid and protect that group, such as injured workmen or workmen out of employment. The courts will scrutinize much more closely situations where the taxes to be saved jeopardize the protection such groups were intended to have.

We have here a corporate reorganization designed to effect some tax savings at the expense of employees' rights to unemployment compensation coverage by bringing them under the agricultural exemption. Exemptions are to be strictly construed, and we can not think of one good reason for a liberal construction of the word "agricultural" merely to exclude the 100 employees of Fors who are employed in the processing plant and feed mill from unemployment benefits. If their services were not incidental to ordinary farming operations in 1964, they were not made so by a corporate reorganization in 1965.

The tenuous thread on which the case for Fors hangs is that though the work of the employees in the feed mill and the processing plant remain the same and their product is used the same way as when separate corporations owned the plants, their merger with a farming corporation makes their work "incidental to an ordinary farming operation."

The statute provides an exemption for employees engaged in "ordinary farming operations." The mind boggles at classifying as an ordinary farming operation a corporate operation in which about 100 of the approximately 132 employees are engaged in the industrial work of processing chickens and manufacturing chicken feed, while only 7 employees perform services on a farm or farms, and the remaining 25 perform their services in a hatchery. We find it impossible to escape the conclusion that we are not faced

with· "an ordinary farming operation" in this case, but rather with a commercial processing operation. Indeed, this impresses us as a commercial processing company seeking a stable and consistent supply of fryers and broilers, rather than a farming operation seeking a way of marketing its product.

Fors has not established that either its feed mill or processing plant operations are incident to "an ordinary farming operation." It has not succeeded in its attack upon the decision of the Commissioner of the Employment Security Department.

The trial court erred in concluding:

> That Fors Farms, Inc. is exempt from assessment by the Employment Security Department of the State of Washington under the Employment Security Act, as the said corporation is exempt under the provisions of R.C.W. 50.04.150, subparagraph 2 thereof, all employment by the said Fors Farms, Inc. being an incident to ordinary farming operations in their agricultural pursuit of raising poultry. (Conclusion of Law No. 2)

The judgment entered, pursuant to that conclusion, is set aside with instructions to enter a judgment affirming the decision of the Commissioner of the Washington State Employment Security Department.[2]

HUNTER, C. J., FINLEY and McGOVERN, JJ., and OTT, J. Pro Tem., concur.

April 1, 1969. Petition for rehearing denied.

[2]The result will be to modify the unemployment tax assessment against Fors insofar as the four field supervisors are concerned, and to affirm the assessment as to the employees in the processing plant and the feed mill.