[No. 48294-7-I. Division One. March 4, 2002.]

WESTERN PORTS TRANSPORTATION, INC., *Respondent*, v. THE EMPLOYMENT SECURITY DEPARTMENT, *Appellant*.

442

*Christine O. Gregoire, Attorney General,* and *Laura J. Watson, Assistant,* for appellant.

*J. Markham Marshall* (of *Preston Gates & Ellis, L.L.P.*), for respondent.

KENNEDY, J. — After Western Ports Transportation, Inc., terminated Rick Marshall's "Independent Contractor Agreement," the Commissioner of the Employment Secu-

rity Department granted unemployment compensation to Mr. Marshall. Western Ports appealed the Commissioner's ruling, and the King County Superior Court reversed. We reverse the Superior Court and reinstate the Commissioner's ruling. The personal services that Mr. Marshall performed for Western Ports constituted "employment" as defined by RCW 50.04.140, and did not fall within the exemption provided by RCW 50.04.140. Federal statutes and underlying federal regulations that permit authorized carriers to engage in interstate commerce utilizing leased trucks-with-drivers are designed to place complete responsibility for possession, use, operation and control of leased equipment on the authorized carrier, regardless of whether, under common-law principles, the lessor or driver provided by the lessor of the equipment might be an independent contractor or an employee of the authorized carrier. This federal statutory and regulatory scheme does not preempt state employment security law by which a person who might be an independent contractor under federal transportation or common law principles may nevertheless be entitled to compensation.

## FACTS

Western Ports Transportation, Inc., is a trucking firm with operating authority issued by the United States Department of Transportation and the Washington Utilities and Transportation Commission. It operates terminals in Washington and California. In order to serve its customers, Western Ports contracts for the exclusive use of approximately 170 trucks-with-drivers. The truck owners either provide and drive their own trucks or hire others to drive them exclusively for Western Ports. While working for Western Ports, Mr. Marshall moved its customers' containers between rail yards and piers in the Seattle area.

Mr. Marshall had previously worked as a driver for a lessor who leased trucks-with-drivers to Western Ports. Through this contact, Mr. Marshall purchased a truck of his

own, and contracted directly with Western Ports. Western Ports' insignia, which was on the truck when Mr. Marshall purchased it, remained on the truck throughout Mr. Marshall's tenure with Western Ports, enabling him to drive under Western Ports' federal and state certifications.

Mr. Marshall signed an Independent Contractor Agreement (ICA) on January 21, 1998. The ICA, which identified Mr. Marshall as the "Contractor" and Western Ports as the "Carrier," is a standard agreement used by Western Ports. The ICA contains various requirements that are dictated by federal regulations governing motor carriers that utilize leased vehicles-with-drivers in interstate commerce; it also contains Western Ports' own rules.

Pursuant to the ICA, Mr. Marshall was required to operate his truck exclusively for Western Ports, have Western Ports' insignia on his truck, purchase his insurance through Western Ports' fleet insurance coverage, participate in all the company's drug and alcohol testing programs, obtain Western Ports' permission before carrying passengers, notify Western Ports of accidents, roadside inspections and citations, keep his truck clean and in good repair and operating condition in accordance with all governmental regulations, and submit monthly vehicle maintenance reports to Western Ports. Western Ports determined Mr. Marshall's pickup and delivery points and required him to call or come in to its dispatch center to obtain assignments not previously scheduled, and to file daily logs of his activities.

Mr. Marshall received "flat-rate" payments for each container he moved. Western Ports' customers made their payments for Mr. Marshall's services directly to Western Ports, and those funds belonged to Western Ports until disbursed. By the terms of the ICA, Mr. Marshall was paid twice per month. Mr. Marshall did not attempt to negotiate the terms of his ICA, although he may have been able to negotiate some of them. The record indicates that other contractors have, in the past, obtained alteration of the exclusivity and insurance provisions in the standard ICA.

Western Ports had broad rights of discharge under the ICA, and could terminate the contract or discipline Mr. Marshall for tardiness, failure to regularly contact the dispatch unit, failure to perform contractual undertakings, theft, dishonesty, unsafe operation of his truck, failure of equipment to comply with federal or state licensing requirements, and failure to abide by "any written company policy."

Mr. Marshall did have some autonomy. For example, he decided which truck to buy; it was not necessary for a Western Ports representative to be present when he picked up freight from a customer; and he decided the route to take in making deliveries. He also could have hired another driver to operate his truck in providing services under terms of the ICA, although he chose not to. He paid all of his truck operating expenses and deducted the expenses on his federal income tax returns.

Mr. Marshall has a Washington State Uniform Business Identification (UBI) number to do business as "RAM Enterprises." The UBI number was obtained in 1992 for a business enterprise not involving trucking or leasing a truck-with-driver. Nevertheless, Mr. Marshall contracted with Western Ports under the designation "Rick A. Marshall dba RAM Enterprises," and he used Ram Enterprises letterhead in corresponding with Western Ports. Under the terms of the ICA, Mr. Marshall was required to be "an employing unit subject as an employer to all applicable local, state, and federal statutes, including but not limited to, unemployment compensation taxes." Clerk's Papers at 107.

The ICA describes the relationship of the parties as follows:

17. **Relationship of Parties**. Contractor is an independent contractor for Carrier. Nothing in this Agreement shall be construed as creating an employer-employee relationship or a guarantee of future employment. The Carrier is interested only in the result obtained under this Agreement; the manner and means of conducting the work are under the sole control of the Contractor. None of the benefits provided by the Carrier to its

employees, including, but not limited to retirement benefits, compensation insurance and employment insurance, are available from the Carrier. The Contractor will be solely and entirely responsible for its acts and for the acts of its agents, employees, servants and subcontractors during the performance of this Agreement. Contractor further agrees to be responsible for payment of all of Contractor's federal, state and local taxes.

Certified Appeal Board R. at 106.

In the summer of 1999, Mr. Marshall chose not to accept assignments transporting goods from Seattle to Tacoma, feeling that his truck was not reliable or comfortable enough. On August 2, 1999, Western Ports terminated Mr. Marshall's ICA. Mr. Marshall feels that he was terminated because of his refusal to do pickups in Tacoma, although his supervisor told him it was because his truck did not meet federal safety standards.

After his discharge, Mr. Marshall applied for unemployment benefits. On September 15, 1999, in an administrative determination, the Employment Security Department (Department) denied Mr. Marshall's application, based upon Western Ports' contention that Mr. Marshall was not an employee but, rather, was an independent contractor exempt from coverage under RCW 50.04.140.

Mr. Marshall requested a hearing to contest the Department's initial determination. An administrative law judge (ALJ) reversed the Department's decision, ruling that Mr. Marshall was entitled to unemployment benefits; thus Western Ports was required to pay the necessary payroll taxes.

Western Ports appealed the ALJ's decision to the Commissioner of the Department. The Commissioner affirmed the ALJ, with some modifications to the ALJ's Findings of Fact and Conclusions of Law.

Western Ports appealed the Commissioner's decision to King County Superior Court. The Superior Court reversed the Commissioner's final order. The Employment Security Department appealed to this court.

## STANDARD OF REVIEW

Judicial review of the Commissioner's final order is governed by the Administrative Procedure Act (APA), ch. 34.05 RCW. This court sits in the same position as the superior court, applying the standards of the APA directly to the record before the agency. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). The burden of demonstrating the invalidity of agency action is on the party asserting invalidity, here, Western Ports. RCW 34.05.570(1)(a). Similarly, under the Employment Security Act, "the decision of the commissioner shall be prima facie correct, and the burden of proof shall be upon the party attacking the same." RCW 50.32.150.

The standards of review of an agency order are set out in RCW 34.05.570(3).

*(a) Findings of Facts: Substantial Evidence Standard*

Administrative findings of fact will be upheld on review when supported by substantial evidence. RCW 34.05.570(3)(e). " 'Substantial evidence is "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises." ' " *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 607, 903 P.2d 433, 909 P.2d 1294 (1995) (quoting *Thieu Lenh Nghiem v. State*, 73 Wn. App. 405, 412, 869 P.2d 1086 (1994) (quoting *Olmstead v. Dep't of Health*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991))). The court will not substitute its judgment on witnesses' credibility or the weight to be given conflicting evidence. *Freeburg v. City of Seattle*, 71 Wn. App. 367, 371-72, 859 P.2d 610 (1993).

*(b) Questions of Law: Error of Law Standard*

The construction of a statute is a question of law reviewed de novo under the error of law standard. *Inland Empire Distrib. Sys. v. Utils. & Transp. Comm'n*, 112 Wn.2d 278, 282, 770 P.2d 624 (1989). A heightened degree of deference is given to an administrative agency's interpretation when the statute is within the agency's field of

expertise. *Id.* However, it is ultimately for the court to determine the purpose and meaning of statutes, even when the court's interpretation is contrary to that of the agency charged with carrying out the law. *Overton v. Econ. Assistance Auth.*, 96 Wn. 2d 552, 637 P.2d 652 (1981).

*(c) Mixed Questions of Law and Fact*

 When reviewing mixed questions of law and fact, we accept the Commissioner's unchallenged factual findings, apply the substantial evidence standard to challenged findings of fact, independently determine the applicable law, and apply the law to the facts. *Tapper*, 122 Wn.2d at 403. The application of the law to the facts is de novo. *Id.*

*(d) Arbitrary or Capricious Standard*

 Finally, for an agency's decision to have been "arbitrary or capricious," the decision must have been willfully unreasonable, without consideration and in disregard of facts or circumstances. *Buell v. City of Bremerton*, 80 Wn.2d 518, 526, 495 P.2d 1358 (1972). An action will not be held arbitrary and capricious when exercised honestly and upon due consideration, even where there is room for two opinions. *Id.*

Under the APA, the appellate court may affirm, reverse, or remand the agency's decision. RCW 34.05.574(1).

## DISCUSSION

 The purpose of unemployment compensation is to reduce involuntary unemployment and ease the suffering caused thereby. RCW 50.01.010. To this end, the Employment Security Act must be liberally construed in favor of the unemployed worker. *Id.* Liberal construction of a statute implies that any exceptions to the statute be narrowly confined. *Miller v. City of Tacoma*, 138 Wn.2d 318, 324, 979 P.2d 429 (1999). Thus, the statutory mandate of liberal construction within the Employment Security Act requires the courts to view with caution any construction that would narrow the Act's coverage. *Shoreline Cmty. Coll. Dist. No. 7 v. Employment Sec. Dep't*, 120 Wn.2d 394, 406, 842 P.2d 938

(1992). Furthermore, exemptions from taxation statutes are strictly construed in favor of applying the tax, with the burden of proof on the party who seeks the exemption. *In re Assessment Against Fors Farms*, 75 Wn.2d 383, 387, 450 P.2d 973 (1969). Courts closely scrutinize an employer's claim of exemption from paying unemployment taxes because those taxes exist to aid a class of people that society has chosen to protect. *Id.* at 391.

RCW 50.04.100 defines "employment" under the Act:

> "Employment", subject only to the other provisions of this title, means personal service, of whatever nature, unlimited by the relationship of master and servant as known to the common law or any other legal relationship, *including service in interstate commerce*, performed for wages or under any contract calling for the performance of personal services, written or oral, express or implied.
>
> Except as provided by RCW 50.04.145, personal services performed for an employing unit by one or more contractors or subcontractors acting individually or as a partnership, which do not meet the provisions of RCW 50.04.140, shall be considered employment of the employing unit: PROVIDED HOWEVER, That such contractor or subcontractor shall be an employer under the provisions of this title in respect to personal services performed by individuals for such contractor or subcontractor.

(Emphasis added.) Therefore, unless an exemption applies, "employment" exists if (1) the worker performs personal services for the alleged employer and (2) if the employer pays wages for those services (or pays under any contract calling for personal services). *Penick v. Employment Sec. Dep't*, 82 Wn. App. 30, 39, 917 P.2d 136 (1996); *Skrivanich v. Davis*, 29 Wn.2d 150, 157, 186 P.2d 364 (1947). Contractual language, such as a provision describing drivers as independent contractors, is not dispositive; instead, the court considers all the facts related to the work situation. *Penick*, 82 Wn. App. at 39.

The Commissioner found that Mr. Marshall performed personal services for Western Ports and that he received

wages for his services. Western Ports has not challenged this finding. Thus, Mr. Marshall is eligible for benefits unless exempt from coverage under RCW 50.04.140 or RCW 50.04.145. Throughout the proceedings the parties have agreed that the only relevant statutory exemption is that of RCW 50.04.140(1).

RCW 50.04.140(1) contains a three-part test:

Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless and until it is shown to the satisfaction of the commissioner that:

(1)(a) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his or her contract of service and in fact; *and*

(b) Such service is either outside the usual course of business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; *and*

(c) Such individual is customarily engaged in an independently established trade, occupation, profession, or business, of the same nature as that involved in the contract of service.

(Emphasis added.) Since the three requirements of the exemption are stated in the conjunctive, an employer must prove all three parts of the test in order for its workers to be exempt from unemployment compensation coverage. Here, the Department argues that the first two prongs of the exemption were not met; Western Ports argues that they were.

The first prong of the exemption test requires determination of whether a worker is free from direction or control during his or her performance of services. The crucial issue is not whether the employing unit actually controls, but whether it has the right to control the methods and details of the worker's performance. *Risher v. Dep't of Labor & Indus.*, 55 Wn.2d 830, 834, 350 P.2d 645 (1960).

In *Penick*, drivers who chose their own routes and work hours were found to be controlled because the company had the right to terminate for unsatisfactory

performance, determine job assignments, sanction for tardiness, and require daily check-ins and truck cleaning. 82 Wn. App. at 43. While Mr. Marshall owned his own truck, paid for his own truck repairs, fuel and insurance, chose his own routes and could have hired another driver to operate his equipment, the factors identified as controls in *Penick* are present here.

Western Ports points out that, at the administrative level, *Penick* involved two different groups of drivers: those who owned their trucks (owner/operators) and those who did not (contract drivers). The Commissioner in that case had found the owner/operators to be exempt, and they did not appeal. Thus, the *Penick* court never reached the issue of whether owner/operators (like Mr. Marshall) might also be eligible for benefits. For whatever reason the Commissioner may have found the owner/operators exempt in that case, nothing in the language of RCW 50.04.100 or *Penick* suggests that truck ownership per se disqualifies a driver from receiving benefits. Instead, the various controls exerted should be examined.

Western Ports also argues that the Department erred in looking at federal and state law requirements as evidence of direction and control. According to Western Ports, the control it exerts over owner/drivers should not count as direction and control for purposes of the Employment Security Act because it is dictated by state and federal regulations governing intrastate and interstate commerce—thus, it reasons, owner/drivers are directed and controlled by law, not by Western Ports.

It is true that a number of the controls exerted by Western Ports over the services performed by Mr. Marshall are dictated by federal regulations that govern the use of leased trucks-with-drivers in interstate commerce. Even so, RCW 50.04.100 suggests that the Department properly can consider such federally mandated controls in applying the statutory test for exemption, in that "service in interstate commerce" is specifically included in the statutory definition of "employment." RCW 50.04.100 (" 'Employ-

ment' . . . means personal service, of whatever nature, . . . including service in interstate commerce[.]"). It would make little sense for the Legislature to have specifically included service in interstate commerce as "employment" only to automatically exempt such service under RCW 50.04.140 based on federal regulations that require a high degree of control over commercial drivers operating motor vehicles in interstate commerce—and, as discussed below, that same degree of control is required regardless of whether such drivers are designated as employees or independent contractors.

But even if we did not consider federally imposed direction and control over leased trucks-with-drivers in interstate commerce as direction and control for purposes of the Employment Security Act, many of the controls exerted over Mr. Marshall's personal services by Western Ports were in addition to those required by federal or state law. For example, Mr. Marshall was required to keep his truck clean, to obtain Western Ports' permission before carrying passengers, and to call or come in to Western Ports' dispatch center to obtain assignments not previously scheduled. In addition, he could be disciplined or discharged for tardiness or failure to contact the dispatch unit, failure to perform contractual undertakings, "theft or dishonesty of any kind as determined by [Western Ports]," unsafe operation of his truck, or failure to report equipment damage, accidents, roadside inspections or citations to Western Ports. Finally, as a catch-all, Mr. Marshall could be terminated for "[a]ny violation of any written company policy."

We also reject Western Ports' contention that federal transportation law permitting arrangements such as that between Mr. Marshall and Western Ports preempts state employment security law.[1] It is true that federal

---

[1] Western Ports cites a California superior court case, *Albillo v. Intermodal Container Service, Inc.*, LASC BC 17450 (Cal. Sup. Ct. & Workers' Comp. Bd. 2000) for this proposition. In the California case it was held that the motor carriers involved were not responsible for unemployment taxes. However, the court also stated that whether an employment relationship exists depends on state law, not federal regulations. *Id.* at 19.

regulations permit motor carriers operating in interstate commerce to utilize owner/drivers to serve the carriers' customers under lease arrangements, as was done here. Such lease arrangements are heavily regulated to insure that lessee/common carriers remain completely responsible for the possession, control, use, and operation of the leased equipment during the term of the lease. 49 CFR § 376.12(c)(1) ("The lease shall provide that the authorized carrier lessee shall have exclusive possession, control and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease."). But 49 CFR § 376.12(c)(4) specifically provides that nothing in subsection (c)(1) is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the lessee/common carrier. Rather, "[a]n independent contractor relationship *may* exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements."[2] 49 CFR § 376.12(c)(4) (emphasis added).

Thus, motor carriers operating in interstate commerce are permitted to provide transportation services to their customers utilizing leased vehicles-with-drivers, and such drivers (including owner drivers) may be independent contractors or they may be employees, but even if they are independent contractors, the carriers cannot escape ultimate responsibility for safety of operations and equipment. The same regulations apply to leased trucks-with-drivers whether or not the drivers are considered employees of the motor carrier or independent contractors.

---

[2] Section 14102 gives the Secretary of the federal Department of Transportation regulatory authority over the leasing of motor vehicles used in interstate commerce, and requires (1) that such leases be in writing specifying the duration and compensation to be paid, (2) that a copy of the written lease be carried in the leased motor vehicle, (3) that leased vehicles be inspected and covered by liability and cargo insurance, and that the lessee/motor carrier "(4) have control of and be responsible for operating those motor vehicles in compliance with the requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier." 49 U.S.C. § 14102(a)(4).

Title 49 of the Code of Federal Regulations, at Part 376, contains detailed regulations governing such lease arrangements. For example, any such lease must be in writing, the leased motor vehicle must be specifically identified in accord with federal regulations, receipts must be executed and delivered when possession of a leased vehicle commences and ends, detailed records must be kept setting forth point of origin and time and date of departure and arrival, and records documenting the carrier's ultimate responsibility for the leased vehicle must be preserved with the freight documents prepared for specific journeys. 49 CFR § 376.11. The lease must specify the amount to be paid for the lease of the vehicle and the driver's services—separately or in combination; the lease must set forth which party will provide signage on the vehicle that reflects (as it must) the carrier's exclusive possession, control and use of the equipment during the term of the lease; the lease must specify which party is responsible for the cost of fuel, permits, tolls, vehicle licenses, and fines for load restrictions; the lessor must be paid within 15 days of submitting the necessary delivery documentation and other paperwork regarding the trip; the lease must specify which party will provide which types of insurance—and insurance for the protection of the public must be provided by the carrier (which may, however, charge the amount back to the lessor if the lease so provides). 49 CFR § 376.12.

On their face, these regulations are designed to fix responsibility for the safe operation of leased vehicles-with-drivers in interstate commerce on the carrier, and to provide a paper trail by which such responsibility can be audited; they are not designed to protect motor carriers from responsibility under state laws governing unemployment benefits. Congress has stated in clear terms that states may not enact or enforce laws or regulations "related to a price, route or service of any motor carrier" with respect to interstate commerce. 49 U.S.C. § 14501(c)(1). Congress has also expressly limited the ability of states to place undue property tax burdens on motor carriers in interstate

commerce. *See* 49 U.S.C. § 14502(b) (limiting assessments on motor carrier transportation property to tax rates that are no higher than those applicable to other taxable property within the taxing district). Thus, when Congress has intended to prohibit state taxing authorities from "burdening" interstate commerce, it has done so expressly, clearly and understandably. Nowhere in the federal motor carrier statutes and regulations brought to our attention by the parties has Congress even mentioned state unemployment law.

"The purpose of Congress is the ultimate touchstone" in every preemption case. *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 11 L. Ed. 2d 179 (1963). We address preemption claims with the presumption that Congress did not intend to supplant state law. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995). We decline to infer that Congress, in enacting federal motor carrier law, intended to preempt state unemployment law. These two types of statutes and regulations have very different policy objectives. Federal transportation law promotes public safety and provides for the easy flow of goods in interstate commerce. State unemployment law provides temporary assistance to workers during periods of involuntary unemployment.[3]

We assume, without holding, that Mr. Marshall did qualify as an independent contractor under federal motor carrier regulations governing interstate commerce, and did qualify as an independent contractor under common law principles. But Washington's statutory definition of employment "means personal service, of whatever nature, unlimited by the relationship of master and servant as known to the common law or any other legal relationship, including service in interstate commerce, performed for wages or

---

[3] State unemployment law must conform in certain respects to the Federal Unemployment Tax Act. *See* RCW 50.98.110; *see generally* 26 U.S.C. § 3304 (I.R.C. § 3304).

under any contract calling for the performance of personal services[.]" RCW 50.04.100. And with certain exceptions not here relevant, "personal services performed . . . by one or more contractors or subcontractors" constitutes employment, unless all three provisions of RCW 50.04.140 are met. RCW 50.04.100. Thus, an individual may be both an independent contractor for some purposes, and engaged in "employment" for purposes of Washington's exceedingly broad definition of covered employment.

In fact, although courts use the term independent contractor in unemployment law, as if one is either an employee and, therefore, entitled to benefits or an independent contractor and, therefore, not entitled to benefits, these terms should not be confused with the common law definitions of master and servant or independent contractor. Our Supreme Court noted this fact in *State Unemployment Compensation & Placement v. Hunt*, 22 Wn.2d 897, 158 P.2d 98 (1945) in response to a contention that the predecessor statute to the current act was unconstitutional because it undertook to redefine master and servant, and independent contractor differently from common law definitions of those terms without the fact of those redefinitions being clearly expressed in the title of the act. The predecessor statute was virtually identical to the current statute, insofar as is relevant here. The court rejected the argument, saying:

> The statute was enacted pursuant to a public policy unknown to the common law. It is not concerned with the rules worked out for determining contract and tort liability as between the parties under the common law. It does not purport to define any service relationships for that purpose. They remain unaffected by the act. We have repeatedly held that we need not inquire as to what the common-law relationship was, since the act included a more extensive field than that covered by common-law definitions.
>
> The only employment defined by the act is the employment intended to be covered by the act for the purpose of the act and none other. That purpose is included in the title of the act. Appellant's point is not well taken.

*Hunt*, 22 Wn.2d at 899 (citations omitted). Thus, the question is not whether Mr. Marshall may be an independent contractor under federal motor carrier law or under common law. Instead, the question is whether he meets all three prongs of the exemption test contained in the act, regardless of common law definitions.

Western Ports has failed to show that Mr. Marshall was free from its direction and control under RCW 50-.04.140(1)(a). Accordingly, we do not need to address the remaining requirements of the three-part test. We conclude that Mr. Marshall's services for Western Ports constituted nonexempt employment.

 Western Ports nevertheless argues that the Commissioner's ruling is arbitrary and capricious because it conflicts with an earlier decision by the same ALJ, who, in an unpublished case involving Western Ports, held that the claimant who drove equipment owned by another contractor was not an employee of Western Ports. We first observe that unpublished decisions have no precedential value. *See* RCW 50.32.095 (Commissioner may designate certain decisions precedential by publishing them). Additionally, RCW 50.04.100 provides that personal services performed by a contractor or subcontractor which do not meet the three-prong test for exemption under RCW 50.04.140 "shall be considered employment of the employment unit: PROVIDED HOWEVER, That such contractor or subcontractor shall be an employer under the provisions of this title in respect to personal services performed by individuals for such contractor or subcontractor." Thus, the contractor referred to in the ALJ's unpublished decision was, by statute, an employer with respect to the personal services there at issue. Mr. Marshall had no employees, thus he did not fall under the proviso. The dispositive issue here is whether Mr. Marshall falls under the three-prong exemption in RCW 50.04.140. We see no conflict between the unpublished decision of the ALJ aforementioned and the Commissioner's ruling in this case.

Neither does the fact that Mr. Marshall deducts his trucking expenses on his income tax return or that Western Ports does not withhold payroll taxes from his compensation make the Commissioner's decision arbitrary and capricious. Although this may seem anomalous—Western Ports considers it so—Washington's definition of covered employment is exceedingly broad and its exemptions must be read narrowly. As we have noted, a person may be an independent contractor under federal motor carrier regulations but still be engaged in covered employment under Washington's employment security law. Western Ports has cited no authority for the proposition that a person cannot be both an independent contractor for purposes of federal tax law and engaged in covered employment for purposes of state unemployment law. Accordingly, we will not address that argument.

We are not the first court in the country to address the question of whether drivers who use their own trucks are employees for purposes of state unemployment compensation law. *See* Debra T. Landis, Annotation, *Unemployment Compensation: Trucker as Employee or Independent Contractor*, 2 A.L.R.4th 1219 (1980). Courts in various states having unemployment statutes similar to Washington's have found owner/drivers to be covered employees for purposes of unemployment compensation, under facts similar to those in this case. *See, e.g., In re Claim of Short*, 233 A.D.2d 676, 649 N.Y.S.2d 955 (1996) (owner/driver, a sole proprietor doing business as "Big John's Trucking," was eligible for unemployment benefits as trucking service's name was placed on his truck, trucking service arranged all of his jobs and set the freight charges, and he was subject to disciplinary sanctions and could not haul loads for others without trucking service's permission); *Byrne Trucking, Inc. v. Employment Div.*, 32 Or. App. 229, 574 P.2d 664, *aff'd*, 284 Or. 443, 587 P.2d 473 (1978) (Truck owner/operators were employed for purposes of unemployment benefits where trucking service engaged in interstate commerce, procured freight to be hauled, collected freight

charges from shippers, and owner/operators paid all expenses incident to operation of trucks, chose their own routes, had complete control of methods of loading trucks and could maximize profits by reducing expenses and hauling more freight; trucking service's sign was displayed on trucks, and trucks driven exclusively for benefit of trucking service. Four truckers testified they considered themselves independent contractors but, with one exception, none had businesses they could sell apart from value of trucks and none had regular employees for whom they paid unemployment benefits.).

Some courts have found truck owner/operators to be not entitled to unemployment benefits. Usually, though not in every case, the owner/drivers in those cases were in the general hauling business, held themselves out to the public as such, and hauled for others in addition to the putative employer. *E.g.*, *Arrow Petroleum Co. v. Murphy*, 389 Ill. 43, 58 N.E.2d 532 (1944); *State Employment Sec. Bd. v. Motor Express, Inc.*, 117 Ind. App. 113, 69 N.E.2d 603 (1946); *A Nu Transfer, Inc., v. Dep't of Labor & Employment Sec. Div. of Employment Sec.*, 427 So. 2d 305 (Fla. Dist. Ct. App. 1983). Among the distinguishing factors in another case in which the owner/drivers were not entitled to compensation were the facts that the owner/operators contacted customers and determined delivery dates, and that the trucking service did not prescribe any rules of operation. *See In re Lafayette Storage & Moving Corp.*, 77 N.Y.2d 823, 567 N.E.2d 240, 566 N.Y.S.2d 198 (1991).

The Commissioner's ruling can hardly be called arbitrary and capricious when courts in other states with similar statutes have reached the same result under similar fact patterns, even though some courts have reached the opposite result under similar circumstances. Even if a court believes that the administrative body's ruling is erroneous, the decision is not arbitrary and capricious if it is reached after due consideration of the facts, or, more simply, if there is room for two opinions. *Buell v. City of Bremerton*, 80 Wn.2d 518, 526, 495 P.2d 1358 (1972).

462

For all the reasons stated in this opinion, we reverse the Superior Court's ruling, and reinstate the Commissioner's final ruling.

ELLINGTON and APPELWICK, JJ., concur.