
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| MACMILLAN-PIPER INC., a Washington corporation, | ) No. 75534-0-I<br>)<br>) |
| Appellant, | )<br>) |
| v. | )<br>) |
| STATE OF WASHINGTON, EMPLOYMENT SECURITY DEPARTMENT, | )<br>)<br>) UNPUBLISHED OPINION |
| Respondent. | )<br>) FILED: December 26, 2017<br>) |

VERELLEN, C.J. — This appeal includes the question whether trucking owner-operators who contracted with MacMillan-Piper, Inc. (MacMillan) qualified for the statutory independent contractor exemption from unemployment taxes. Consistent with a recent decision by Division III of this court in Swanson Hay Co. v. State Employment Security Department,[1] we conclude MacMillan exerted extensive control over the method and detail of how the driving services were to be performed and therefore did not establish it was entitled to an exemption under RCW 50.04.140(1)(a).

---

[1] ___ Wn. App. ___, 404 P.3d 517 (2017).

The Federal Aviation Administration Authorization Act (FAAAA) preempts state laws that significantly impact motor carriers' prices, routes, or services.[2] Because the Employment Security Act (ESA), Title 50 RCW, applies generally to state employers and has a tenuous relationship with the carrier's prices, routes, or services, the ESA is not federally preempted in this setting.

The Employment Security Department (Department) calculated the original audit assessment amount based on the records MacMillan provided. MacMillan does not establish the assessment was arbitrary and capricious or that its due process rights were violated.

Therefore, we affirm.

## FACTS

MacMillan is involved in drayage, the moving of freight containers and cargo a short distance from point to point, often from the port to a rail yard or other designated place. To provide those services, MacMillan contracts with "owner-operators" who own tractors or tractor-trailers. The owner-operators provide the trucking equipment with drivers to perform drayage services for Macmillan. MacMillan operates under authority from the Federal Motor Carrier Safety Administration and the Department of Transportation. The owner-operators haul freight using MacMillan's operating authority.

The owner-operator contracts include provisions addressing the obligations of the owner-operators, such as (i) MacMillan has the "right to full possession and

---

[2] 49 U.S.C.A. § 14501(c)(1).

control" of the equipment during the lease term, (ii) owner-operators must report for duty at 7:30 a.m. with adequate fuel for a full day's work, must notify MacMillan by 7:00 a.m. if they will not be available that day, and must give two weeks' notice if they will not be available for two or more consecutive days, (iii) an owner-operator's refusal to perform a dispatch is considered a material breach of the agreement, (iv) owner-operators shall haul no freight for other carriers during the lease term without MacMillan's written permission, (v) drivers must meet federal and state safety requirements and may be rejected by MacMillan "for any reason," (vi) owner-operators must submit to MacMillan records of hours on duty, daily inspections, vehicle tonnage, log sheets and other documents, (vii) owner-operators must "immediately" report collisions or citations to MacMillan, maintain the equipment consistent with regulations, perform daily re-trip inspections, consent to installation of communication equipment "at the sole discretion and for the sole benefit of MacMillan-Piper," and display decals or placards on the equipment indicating it is leased to MacMillan.[3]

Other than requiring owner-operators to report for duty daily at 7:30 a.m., MacMillan does not set or control the hours owner-operators work, choose the routes they drive, or dictate the order in which they make deliveries. The owner-operators are responsible for all operating expenses, including maintenance, licensing, fuel, tolls, permits, insurance, and costs for any laborers or drivers they hire.

---

[3] Administrative Record (AR) at 216-17.

In 2011, the Department audited MacMillan. The audit determined that 69 owner-operators should be reclassified as "in employment" instead of independent contractors under the ESA. The Department issued MacMillan a tax assessment covering the first quarter of 2009 through the third quarter of 2011 in the amount of $130,440.81. MacMillan filed an administrative appeal. The administrative law judge (ALJ) denied MacMillan's motion for summary judgment. The ALJ granted the Department's cross-motion for summary judgment, ruling the owner-operators were in MacMillan's employment under RCW 50.04.100 and not exempt under RCW 50.04.140(1) because they performed personal services for wages, which benefited MacMillan, and they were not free from MacMillan's control or direction.

The ALJ denied MacMillan's motion to dismiss the assessments and held an evidentiary hearing to determine the accuracy of the assessed amount. The ALJ entered an initial order finding that 30 percent of the payments MacMillan made to owner-operators were for driving services and were thus taxable. The ALJ found that two of the drivers should have been excluded because the only instruction they received was where to pick up and transport the freight, and they each had their own motor carrier authority.

On review, the commissioner's review office issued the commissioner's final decision affirming the ALJ's ruling. The commissioner confirmed that MacMillan exerted "extensive controls over the methods and details of how the driving services are to be performed by the owner-operators"[4] and failed to satisfy the

---

[4] AR at 1116.

4

requirements of RCW 50.04.140(1)(a). The commissioner did not address the remaining elements of the independent contractor exemption test. MacMillan appealed, and the King County Superior Court upheld the order.

MacMillan appeals.

## ANALYSIS

Although there are minor differences in facts and arguments, we agree with Division III's conclusion in Swanson Hay that owner-operators with similar contracts are not exempt from unemployment taxes.[5]

Judicial review of the commissioner's decision is governed by the Administrative Procedure Act (APA), ch. 34.05 RCW.[6] We sit in the same position as the superior court and apply the standards of the APA directly to the record before the agency.[7] On review of a decision by the commissioner, we give great deference to the commissioner's factual findings and substantial weight to the agency's interpretation of law.[8]

### I. RCW 50.04.140(1) Exemption

Under Washington's ESA, employers must contribute to the unemployment compensation fund for the benefit of their employees.[9] The ESA is intended to

---

[5] 404 P.3d at 523.

[6] RCW 34.05.510; RCW 50.32.120.

[7] W. Ports Transp., Inc. v. Emp't Sec., 110 Wn. App. 440, 449, 41 P.3d 510 (2002).

[8] Wilson v. Emp't Sec. Dep't of State, 87 Wn. App. 197, 200-01, 940 P.2d 269 (1997).

[9] RCW 50.01.010; RCW 50.24.010.

mitigate the effects of involuntary unemployment by applying the "'insurance principle of sharing the risks, and by the systematic accumulation of funds during periods of employment.'"[10]  Courts liberally construe the statute to accomplish this goal, viewing "with caution any construction that would narrow" coverage.[11] "[E]xemptions from taxation statutes are strictly construed in favor of applying the tax, with the burden of proof on the party who seeks the exemption."[12]  An individual may be both an independent contractor for some purposes and engaged in "employment" for purposes of the state's broad definition of covered employment.[13]

"Employment" is defined under RCW 50.04.100.  Unless an exemption applies, "employment" exists if the worker performs personal services for the alleged employer and if the employer pays wages for those services.[14] RCW 50.04.140 includes an exemption to unemployment taxes.[15]  The inquiry under the statute is not whether owner-operators are independent contractors for other purposes but whether they meet all of the prongs of the exemption test

---

[10] Penick v. Emp't Sec. Dep't, 82 Wn. App. 30, 36, 917 P.2d 136 (1996) (quoting RCW 50.01.010).

[11] W. Ports, 110 Wn. App. at 450 (citing Shoreline Cmty. Coll. Dist. No. 7 v. Emp't Sec. Dep't, 120 Wn.2d 394, 406, 842 P.2d 938 (1992)).

[12] Id. at 451 (citing In re Assessment Against Fors Farms, 75 Wn.2d 383, 387, 450 P.2d 973 (1969)).

[13] Id. at 458.

[14] Id. at 451.

[15] RCW 50.04.140.

contained in the ESA, "regardless of common law definitions."[16] The term

"employment" under the ESA is "unlimited by the relationship of master and

servant as known to the common law or any other legal relationship."[17] The ESA

offers two methods to establish the exemption under RCW 50.04.140. MacMillan

focuses its argument on the "control" subsection of the first method.

Under RCW 50.04.140(1), the employer must prove:

> (1)(a) *Such individual has been and will continue to be free from control or direction over the performance of such service, both under his or her contract of service and in fact*; and
>
> (b) Such service is either outside the usual course of business for which such service is performed, or that such service is performed outside of all the places of business of the enterprises for which such service is performed; and
>
> (c) Such individual is customarily engaged in an independently established trade, occupation, profession, or business, of the same nature as that involved in the contract of service.[18]

MacMillan argues that federally mandated lease terms do not preclude an

independent contractor relationship and that in Western Ports Transportation, Inc.

v. Employment Security Department, this court wrongly decided that such owner-

operator lease provisions establish control for purposes of unemployment taxes.[19]

Specifically, MacMillan contends that Western Ports conflicts with 49 C.F.R.

§ 376.12, which requires carriers to "assume complete responsibility" for the

---

[16] W. Ports, 110 Wn. App. at 459.

[17] RCW 50.04.100; W. Ports, 110 Wn. App. at 458-59.

[18] RCW 50.04.140(1) (emphasis added).

[19] 110 Wn. App. 440, 41 P.3d 510 (2002).

operation of the leased equipment and to have "exclusive possession, control, and use of the equipment."[20]

49 C.F.R. § 376.12(c)(4) provides:

Nothing in the [required exclusive possession, control and use provision] is intended to affect whether the lessor . . . is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.[21]

This qualifying provision is silent about the other federal lease requirements and safety regulations governing the relationship between motor carriers and owner-operators, which are included in MacMillan's contract.[22]

MacMillan asserts "[i]t is contrary to extensive authority that makes it clear that when the government controls the contract provisions, it is *the government*, not the contracting parties, exercising control."[23]

Thus, the critical inquiry is whether it is improper to consider the federally mandated limitations required for lease provisions for owner-operators. This court in Western Ports recognized it is proper to consider them,[24] and the Swanson Hay court arrived at the same conclusion.[25] We agree. Importantly, the statutory standard is independent of and unrelated to common law concepts underlying the

---

[20] 49 C.F.R. § 376.12(c)(1).

[21] 49 C.F.R. § 376.12(c)(4).

[22] W. Ports, 110 Wn. App. at 456-57.

[23] Br. of App. at 38.

[24] W. Ports, 110 Wn. App. at 454.

[25] Swanson Hay, 404 P.3d at 532-33.

independent contractor analysis in other settings. Here, "control" in its plain meaning extends to the right to control, regardless of the source. We decline to look beyond the plain language. The previously listed lease provisions provide MacMillan an extensive right to control the method and details of driving services.

MacMillan argues it established the second and third elements of RCW 50.04.140. We do not reach these two elements given our conclusion on the control element of RCW 50.04.140(1).

## II. Federal Preemption

MacMillan argues federal law preempts the assessment. MacMillan focuses on Rowe v. New Hampshire Motor Transport Association,[26] arguing that decision overruled Western Ports.

"'The purpose of Congress is the ultimate touchstone' in every preemption case."[27] "We address preemption claims presuming Congress did not intend to supplant state law."[28] "In Washington, there is a strong presumption against finding preemption and state laws are not superseded by federal law unless it can be determined it is the clear and manifest purpose of Congress."[29] As noted in Swanson Hay, the Western Ports court did not address express preemption, but

---

[26] 552 U.S. 364, 128 S. Ct. 989, 169 L. Ed. 2d 933 (2008).

[27] W. Ports, 110 Wn. App. at 457 (quoting Retail Clerks Int'l Ass'n v. Schermerhorn, 375 U.S. 96, 103, 84 S. Ct. 219, 222, 11 L. Ed. 2d 179 (1963)).

[28] Id. (quoting New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654-55, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995)).

[29] Dep't of Labor & Indus. v. Lanier Brugh, 135 Wn. App. 808, 815-16, 147 P.3d 588 (2006).

more recent authority instructs that state laws that affect prices, routes, or services in "'only a tenuous, remote, or peripheral . . . manner'"[30] do not trigger express preemption.

MacMillan contends, unless preempted, the federally mandated lease provisions will *always* establish control and, unlike the carriers in Swanson Hay, MacMillan does not own any trucks. Thus, without preemption, its business model will become obsolete.

In cases in which courts have found preemption, the statute established a binding requirement on how the *service* was to be performed.[31] The ESA is a generally applicable background law for state employers, similar to the meal and rest break laws in Dilts v. Penske Logistics, LLC[32] and the minimum wage laws in

---

[30] Rowe, 552 U.S. at 371 (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 390, 1121 S. Ct. 2031, 119 L. Ed. 2d 157 (1992)); Dilts v. Penske Logistics, LLC, 769 F.3d 637, 643 (9th Cir. 2014) (quoting id.); see also Dan's City Used Cars, Inc. v. Pelkey, 569 U.S. 251, 133 S. Ct. 1769, 1773, 185 L. Ed. 2d 909 (2013) ("Although [49 U.S.C.] § 14501(c)(1) otherwise tracks the ADA's air-carrier preemption provision, the FAAAA formulation's one conspicuous alteration— addition of the words 'with respect to the transportation of property'—significantly limits the FAAAA's preemptive scope. It is not sufficient for a state law to relate the 'price, route, or service' of a motor carrier in any capacity; *the law must also concern a motor carrier's 'transportation of property.'")* (emphasis added).

[31] See Rowe, 522 U.S. at 372-73 (holding the FAAAA preempted state tobacco laws, recognizing the state statute directly targeted trucking and delivery services and the licensing statute required "carriers to offer a system of services that the market does not now provide" and would "freeze into place services that carriers might prefer to discontinue in the future."); Morales, 504 U.S. at 388 (holding the FAAAA preempted state standards against deceptive airline fare advertising because each standard included an express reference to airfares, and the standards collectively established "binding requirements as to how tickets may be marketed if they are to be sold at given prices.")

[32] 769 F.3d 637 (9th Cir. 2014).

Filo Foods, LLC v. City of SeaTac[33] and Californians for Safe and Competitive Dump Truck Transportation v. Mendonca.[34] MacMillan does not establish the unemployment tax directly regulates the transportation of property or the service of a motor carrier,[35] nor does MacMillan distinguish the holding in First Circuit cases that "motor carriers are not exempt 'from state taxes, state lawsuits of many kinds, and perhaps most other state regulation of any consequence.'"[36]

MacMillan emphasizes the $53,833.69 in unemployment insurance tax liability it will owe over a nearly three-year period would increase its operating costs. But as the Ninth Circuit recognized, a state law will not be preempted "just because it shifts incentives and makes it more costly for motor carriers to choose some routes or services *relative* to others, *leading the carriers to reallocate resources or make different business decisions.*[37]

Here, MacMillan offered declarations in support of summary judgment suggesting the unemployment taxes would severely impact its business model, but none of those declarations stated the unemployment tax would be a determinative factor affecting its model.[38] MacMillan relies on cases from other jurisdictions, but

---

[33] 183 Wn.2d 770, 357 P.3d 1040 (2015).

[34] 152 F.3d 1184 (9th Cir. 1998).

[35] See Dan's City, 569 U.S. at 261, 265.

[36] Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d 429, 440 (1st Cir. 2016) (quoting DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 89 (1st Cir. 2011)).

[37] Dilts, 769 F.3d at 647 (emphasis added).

[38] See AR at 72-85.

those cases are not persuasive; such a conclusory impact does not trigger field or conflict preemption.[39]

We agree with Swanson Hay and conclude there is no preemption in this setting.

### III. Audit and Assessment

MacMillan argues the Department's audits and assessments are arbitrary and capricious. We disagree.

Courts may reverse a final order that is arbitrary and capricious.[40] An administrative agency order is arbitrary and capricious if it is willful and unreasoning and disregards or does not consider the facts and circumstances underlying the decision.[41] "An action will not be held arbitrary and capricious when

---

[39] See Schwann, 813 F.3d 429, 440 (acknowledging the state's interference with a business decision implicates the way in which a company chooses to allocate its resources would have a "logical effect" on routes, but that court did not perform its analysis under the control prong of its statute. That court also clarified that "motor carriers are not exempt 'from state taxes, state lawsuits of many kinds, and perhaps most other state regulation of any consequence.'" (quoting DiFiore, 646 F.3d at 89)); see also Vargas v. Spirit Delivery & Distrib. Servs., Inc., 245 F. Supp. 3d 268, 283-84 (D. Mass. 2017) (noting the freedom from control prong is one of the typical elements used to determine independent contractor statutes in many states and for purposes of federal law and thus are less likely to have an effect on a carrier's pricing, routes, and services. The court acknowledged empirical evidence is not necessary, but the proponent "must still make more than conclusory allegations" that such a finding "would have a significant impact on its process, routes or services." And it recognized that the policy behind statutory schemes that protect workers are "traditionally within the police powers of the state and that while many rules and regulations applicable to carriers affect their price, routes and services, such impact is generally tenuous and does not require the carriers to change their business model.").

[40] RCW 34.05.570(3)(i).

[41] Beatty v. Washington Fish and Wildlife Com'n, 185 Wn. App. 426, 341 P.3d 291 (2015).

exercised honestly and upon due consideration, even where there is room for two opinions."[42]

Here, the Department calculated its assessment based on the total remuneration reported on MacMillan's Internal Revenue Service 1099 forms as nonemployee compensation and backed out wages that exceeded the maximum taxable wage base. MacMillan argues the Department arbitrarily failed to bifurcate remuneration between equipment and services, resulting in overinflated taxes. But MacMillan did not provide the Department with records as required by RCW 50.12.070 and WAC 192-310-050 on which contrary calculations could be made.

RCW 50.12.070(1)(a) requires employers to keep true and accurate work records "containing such information as the commissioner may prescribe." The commissioner requires employers to keep records of worker total gross pay period earnings, the specific sums withheld from the earnings of each worker, and the purpose of each sum withheld to equate to net pay.[43] Employers are also required to keep payroll and accounting records,[44] and they must keep these records open to inspection.[45] When an employer fails to provide sufficient wage information during an audit, the Department may generate an "arbitrary report," in which it may

---

[42] W. Ports, 110 Wn. App. at 450.
[43] WAC 192-310-050(1)(g)-(i).
[44] WAC 192-310-050(2)(a).
[45] RCW 50.12.070(1)(a).

calculate an assessment based on "information otherwise available to the [D]epartment."[46]  This report is "deemed to be prima facie correct."[47]

MacMillan did not produce records showing which portions of the 1099 payments were for wages and which were for equipment lease.  MacMillan only offered testimony from a forensic accountant who "researched the costs of trucking by reviewing articles and websites on the internet and by talking to selected trucking companies," but he did not review any of MacMillan's records showing an equipment allocation, or talk with any owner-operators.[48]

MacMillan does not establish the Department acted arbitrarily and capriciously.

MacMillan argues the audit violated both procedural and substantive due process.  "Procedural due process requires notice and an opportunity to be heard prior to final agency action."[49]  "To establish a procedural due process violation, the party must establish that he or she has been deprived of notice and opportunity to be heard prior to a final, not tentative, determination."[50]  An agency violates substantive due process when its decision is "irrational, arbitrary and capricious" or "was tainted by improper motive."[51]

_____

[46] WAC 192-340-020; RCW 50.12.080.

[47] RCW 50.12.080.

[48] AR at 1040 (Finding of Fact 4.26).

[49] Motley-Motley, Inc. v. State, 127 Wn. App. 62, 81, 110 P.3d 812 (2005).

[50] Id.

[51] Id. at 82.

MacMillan had notice of the assessment and an opportunity to be heard before the Department's final order. Once the Department issues an assessment, the employer has 30 days to file an appeal.[52] If the employer does not file a timely appeal, the assessment becomes final.[53] By filing an appeal, MacMillan had an opportunity to be heard before the assessment became final. And "to constitute a violation, the party must be prejudiced. Prejudice relates to the inability to prepare or present a defense."[54] MacMillan does not establish it was prejudiced in its ability to prepare or present its challenge to the assessment.

MacMillan's substantive due process claim focuses on an alleged improper/bad-faith motive by the Department, including the Department's failure to implement its prior agreement in similar audits that 70 percent of remuneration should be allocated to equipment. MacMillan relies on Motley-Motley, Inc. v. State, but that case addressed substantive due process related to property rights and land use decisions.[55] MacMillan does not offer compelling authority that those same fundamental rights attach to an audit, or that a de novo hearing and two stages of judicial review did not ameliorate those concerns.

MacMillan contends the assessment is "void" because it exceeded statutory authority. But orders are void only if there is a defect in personal or subject matter

---

[52] RCW 50.32.030.

[53] RCW 50.32.030.

[54] Motley-Motley, 127 Wn. App. at 81 (citation omitted).

[55] 127 Wn. App. 62, 110 P.3d 812 (2005).

jurisdiction.[56] MacMillan does not establish the commissioner administered authority outside of "the provisions of the act itself and the rules prescribed thereby."[57] An agency lacks subject matter jurisdiction only when it does not have authority to adjudicate the "type of controversy" in question.[58] Here, the Department has broad subject matter jurisdiction to issue orders and notices of assessment for unemployment insurances taxes.[59]

We conclude the Department's assessments were not arbitrary and capricious, nor did they violate due process.

Therefore, we affirm.

Cox, J.

WE CONCUR:

---

[56] Marley v. Dep't of Labor & Indus., 125 Wn.2d 533, 537-38, 886 P.2d 189 (1994).

[57] In re Jullin, 23 Wn.2d 1, 15, 158 P.2d 319 (1945).

[58] Marley, 125 Wn.2d at 539; Dougherty v. Dep't of Labor & Indus., 150 Wn.2d 310, 317, 76 P.3d 1183 (2003); Magee v. Rite Aid, 167 Wn. App. 60, 72-73, 277 P.3d 1 (2012).

[59] Title 50 RCW; Marley, 125 Wn.2d at 542.